# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                        )
SAEED HATIM,                                            )
                                                        )
                    Petitioner,                         )
        v.                                              )        Civ. No. 05-1429 (RCL)
                                                        )
BARACK OBAMA, *et al.*,                                 )
                                                        )
        Respondents.                                    )
———————————————————————  )

**DECLARATION OF DAVID H. REMES IN SUPPORT OF
EMERGENCY MOTION CONCERNING ACCESS TO COUNSEL**

**I, DAVID H. REMES,** under penalty of perjury pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

1.      I am a human rights attorney and a member of the bar of the District of Columbia, admitted to practice in the federal courts in the District of Columbia. I submit this Declaration in support of the above-titled motion.

2.      I am counsel to Petitioner Saeed Hatim (ISN 255), whom respondents, through the Joint Task Force—Guantánamo ("JTF"), have held at Guantánamo since June 2002. I have represented Mr. Hatim since July 2005, when this case was filed. I am also counsel to more than a dozen other Guantánamo detainees.

3.      All of the clients mentioned herein are hunger strikers. The strike started on or about February 2013 in response to a search of the men's Qurans by prison staff. This hunger strike is the largest and most protracted in the prison's 11 year, 5 month history. The military currently counts 103 of the 166 detainees as hunger strikers; the detainees say the true count is higher. At least 30 of the 103, including two of my clients, are currently being force fed.

4.      I began visiting detainee clients in Guantánamo in late 2004. I have visited clients there dozens of times since then. Mr. Hatim is among those I have visited. Though cleared for release long ago by the Obama Administration, Mr. Hatim is still imprisoned.

5.      Currently, most detainees are held in Camp 5 or Camp 6. The camps sit together on one side of a road. Another facility, Camp Echo ("Echo"), sits on the other side of the road. Historically, detainees have met with counsel either at Camp Echo or in Camp 5 or Camp 6, often as requested by the detainee or his counsel. (Attorney/client meetings in Camp 5 have been discontinued.) Meetings in Camp 6 are far less burdensome for the detainee and prison staff because detainees must be transported (while shackled) by van to meetings in Echo. Detainees have telephone calls with their lawyers in Camp Delta ("Delta"); this also requires transport of detainees in a van (while shackled) from the detainee's camp to Delta, which is located some distance from Camps 5 and 6. Attachment A (satellite image of camp layout).

**ATTEMPTED MEETINGS WITH MR. HATIM**

6.      On or about March 5, 2013, I received an email from Ali Hatim, Mr. Hatim's brother. According to Ali, Mr. Hatim said, in a family call on or about February 19, that he was hunger striking and had not eaten in 13 days (i.e., since February 6), and that this was the last time they would hear his voice. Ali said to me, "You should talk to Obama. What does he want from my brother after 11 years? Isn't 11 years enough?" In a further email on May 19, Ali reported that Mr. Hatim has not spoken with his family since the mid-February call.

7.      I had already learned of the hunger strike from fellow habeas lawyers. On receiving Ali's message, I arranged a visit to Guantánamo as soon as possible. I arranged for client meetings from Monday, March 4 through Friday morning, March 8.

8.      I scheduled a meeting with Mr. Hatim on Friday morning, but I did not meet with him. He and another client, Majid Ahmad (ISN 41), sent word through another client that they

were too weak to see me. Salman Rabeii (ISN 508), with whom I met, told me that Mr. Hatim

had lost 40 pounds in the 29 days since the hunger strike began.

9.      I returned to Guantánamo for client meetings from Tuesday, April 30 through

Friday, May 3. I scheduled a meeting with Mr. Hatim on May 1. It was important that we meet

to discuss issues relating to the remand proceeding in his case, including the status conference

scheduled for May 3, 2013. When I arrived in Echo, however, the Assistant Staff Judge

Advocate ("ASJA") on duty told me that Mr. Hatim refused to see me.

10.     As procedure contemplates, I gave the ASJA a "refusal letter" to bring to Mr.

Hatim, asking him to reconsider. I explained the need to meet concerning the status conference.

Returning with Mr. Hatim's response, the ASJA reported that Mr. Hatim told him that he would

meet with me only if we could meet in his camp, Camp 6. I had asked that Mr. Hatim, if he still

refused despite my letter, to send the ASJA back with a note explaining why, but the ASJA told

me that detainees are not allowed to answer refusal letters in writing. If Mr. Hatim told the ASJA

why he would meet with me only in his camp, the ASJA did not tell me.

11.     I next filled out a request form, addressed to the Staff Judge Advocate, asking that

that Mr. Hatim be allowed to meet with me in his camp. I attached to the request form a

declaration explaining, among other things:

> The crux of the matter is that the current command has made a detainee's
> experience of being transferred to Camp Echo so miserable, especially in
> the context of the ongoing hunger strike, as to deter [Mr. Hatim] from
> exercising his constitutional right to seek habeas corpus, in violation of
> that right.

I noted that I needed to confer with Mr. Hatim because we, his lawyers, "require[d] direction"

from from Mr. Hatim with respect to several issues that might arise at the status conference on

May 3. *Id.*

12.      JTF summarily rejected my request, stating that Mr. Hatim would not be allowed to meet with me in Camp 6 in any circumstances. On May 3, another client, Abdalmalik Wahab (ISN 37), told me that Mr. Hatim, having been on his hunger strike for 87 or 88 days, was in a "bad, bad way."

13.      I had scheduled a meeting with another client, Mukhtar Al-Warafi (ISN 117), for May 2. Mr. Al-Warafi also refused to meet with me. I sent Mr. Al-Warafi a refusal letter asking him to reconsider; this time, I did not ask for a written response. The ASJA reported that Mr. Al-Warafi still refused. I asked why. The ASJA replied, "general conditions."

14.      Mr. Wahab told me that the true reason Mr. Al-Warafi refused to meet with me was far more specific. I reproduce below my record of what Mr. Wahab told me, using quote marks to indicate statements that I recorded verbatim. In some instances, in the interest of clarity and completeness, I have joined together statements on the same subject appearing in different places in my notes.

15.      Mr. Wahab stated:

Yesterday, a translator and official came to see him with a message: "Whenever anyone is moved out of Camp 5 for any reason, or back into Camp 5, we will search him, including his private parts, and we will hold his private parts. [Mr. Wahab cupped a hand to illustrate.] Yesterday, when the SJA brought your refusal note to Mukhtar, Mukhtar said to the official, "Why are you conducting these searches? Are you trying to keep me from meeting with my attorney? Family calls? It's as if you're discouraging us." That's why Mukhtar refused to meet with you. He told the official to tell you, "I want to meet with you. I have many things to discuss with you."

16.      Shaker Aamer (ISN 239) wrote, in a letter of May 3[1]:

 On May 1, "Rover," accompanied by an Arabic interpreter, came to each detainee and informed us that "if you go to your appointment you will be frisk-searched and they will pat and shake our private parts, so we can't go

---

[1] Covington & Burling does not represent Mr. Aamer. Mr. Aamer wrote this letter in broken English. I have clarified his writing hewing as closely as possible to his text.

to any appointment. We are ordered by our religion to protect our privates, and no one is going to violate his religion for an appointment. So please make sure to write to the camp administration and Obama administration and the Defense Department to let them know what is going on down here. They are preventing us from meeting or talking to lawyers. The reason is clear. Keep in mind that this kind of search has been prohibited since 2005, General Hood's time. They have all kinds of equipment for finding hidden things without grabbing our privates. . . .

17.     Similarly, another client, Yasein Ismael (ISN 522) recently sent me a letter reporting that the prison staff has a policy of "[s]earching the private parts of people going out of the camp in a move meant to stop people from seeing their attorneys or informing their families by the phone of what's happening."

18.     Salman Rabeii (ISN 508), another client with whom I met on this visit, put the matter plainly:

> When they search you in Camp 6, the guards hold your privates. One guard said that the Colonel ordered it. Another guard said, "If you want to stop it, stop your hunger strike."

**ILLUSTRATIVE CONDITIONS OF OTHER CLIENTS**

19.     The physical and mental condition of the clients with whom I met in my early March and early May visits, and the information they provided me, suggest Mr. Hatim's weakened condition. All were painfully thin and drawn in March, and more so in May. They are shadows of the men I knew.

**Yasein Ismael (ISN 522)**

20.     In our meeting on March 5, Mr. Ismail said he had lost 35 pounds since the hunger strike began on February 6, dropping from 150 to 115 pounds. He said that he was very weak and could not keep his balance. He said that he nearly decided not to see me but took sugar water to give him the energy. He said, "The brothers are desperate. They feel like they are living

in graves." When we met on April 30, Mr. Ismail's arms were like sticks. He said his weight had

fallen to about 105 pounds, a 45 pound drop since early February. He was being force fed.

    21.     In our April 30 meeting, Mr. Ismail stated:

> "The temperature is very cold. The problem is made worse because people
> are on a hunger strike. (I'm better off because I'm being force-fed.) I don't
> want to die, but I don't want to give up my hunger strike, so I'll take
> honey or sugar water, or once a week, Ensure.

> "You cannot imagine the situation here. People walk around like ghosts."

Mr. Ismael also described the privations in the isolation cells to which the Camp 6 men were

moved after the April 13 raid. He also provided a detailed history of the events leading to the

present crisis, beginning with the September 2012 raid of Camp 6.

**Salman Rabeii (ISN 508)**

    22.     I met with Mr. Rabeii on March 7. He said that he had had lost 28 pounds.

Though the meeting hut was normal room temperature, Mr. Rabeii was wearing three layers of

clothing, and he said that he was freezing. When I met with Mr. Rabeii on May 2, he said that his

weight had fallen from 197 to 131 pounds—a 66 pound drop since early February. He stated:

> "The current treatment is worse than anytime before. It's very, very cold
> in the block. It's so cold that the brothers happily accept orders to meet
> with interrogators or go to the clinic, just to get out.

> "The guards keep noisy fans going. Day and night, they stomp their feet
> and snap their fingers going up and down the corridor, and they speak
> loudly. You're allowed two hours of rec, to which the take you at arbitrary
> times day and night. We can't sleep.

> "The only clothes that I'm allowed are a t-shirt, underwear, trousers, and
> socks. My covering is a suicide smock of the type that Adnan Latif used to
> wear. I have an isomat, no towels, toothbrush, or toothpaste.

> "I surrendered my Quran in 2006 to keep it from being searched. All I
> have now is a book interpreting the Quran. The authorities lie to the
> media: They won't take our Qurans. There is no TV. The only news we
> get is from tube-fed hunger strikers."

Mr. Rabeii also gave me a first-hand account of the April 13 raid.

**Shaker Aamer (ISN 239)**

23.     In a meeting with my co-counsel Clive Stafford Smith on May 7, Mr. Aamer stated that the noise from the fans and the noise of the guards and their radios keep detainees up day and night. *See also* Attachment B, Declaration of Clive Stafford Smith, ¶¶ 9, 10, 12, 14, 22 (Mar. 29, 2013).

**Uthman Uthman (ISN 27)**

24.     When we met on March 7, Mr. Uthman said that his weight had dropped from 167 to 134 pounds. He said that his blood sugar fell to dangerously low levels (25–28) before efforts were made to restore it to safe levels—after which it fell back again. When we met on May 2, Mr. Uthman told me that his weight had fallen to about 119 pounds—a nearly 50 pound drop since early February. He was in the hospital and was being force-fed. He said:

> "I'm not ready to die. I don't want to die, but I don't want to give up my hunger strike. I don't want to be force-fed, but if you force-feed me, at least do it humanely."

In our March 7 meeting, Mr. Uthman gave me a first-hand account of the early September raid of Camp 6, the shooting in the recreation yard in late January, and the Quran searches that sparked the hunger strike in early February.

**Abdulsalam al-Hela (ISN 1463)**

25.     I met with Mr. Al-Hela on March 6. He told me that his weight had dropped 30 pounds, falling from 150 to 120 pounds. He too was wearing extra layers of clothing, and long johns. He had started walking with an aluminum cane because of pains in his legs. When I met with him on May 1, he was weak, gaunt, and initially unfocused. He clearly had lost more weight. He stated:

Nobody can describe this who hasn't lived here. I'm diabetic and afraid I'll fall into a coma or lose vision. I've lost consciousness two or three times, but I managed to wake up on my own. I didn't stop drinking but I can't drink enough because of my stomach.

Last time you were here, people could keep alive by sharing small amounts of food. Saifullah Paracha [an ailing 65 year-old detainee, and another client of mine, who is not hunger striking] might give us an apple. But after the April 13 raid, men are in isolation cells, and sharing is impossible. If you are going to force-feed us no matter what, then don't stretch it out, force-feed us now. Stretching it out will keep me alive but ruin my organs. The doctors are violating their ethics by waiting until the last minute

If they came to us and negotiated, saying we'll raid if you don't uncover the cameras, we'd have uncovered the cameras. Covering the cameras was a bid to have someone come and negotiate—talk about the Quran, what should be in our cells. Either don't search our Qurans or give us e-readers.

"The rules change with every rotation or change of senior officers," he added.

### Hussain Almerfedi (ISN 1015)

26.     Hussain Almerfedi and I met on March 4. Mr. Almerfedi said that he had dropped 45 pounds, falling from 175 to 130 pounds. He said, "I'm always lying down. I'm sick." He stated, "The administration created this problem and doesn't want to compromise." He also said, "Treat me as well as you treat the iguanas, even insects."

### Abdalmalik Wahab (ISN 37)

27.     On March 29, 2013, I spoke with Mr. Wahab by phone. He said that he had been on a hunger strike for 50 days or more and had dropped 40 pounds, falling from 195 to 155 pounds. He said he was speaking with me wearing several layers of clothing. He said that had lost consciousness more than 10 times. (The clinic revives him with sugar water and forced consumption of honey.) He said, "It is very difficult to walk, speak, focus, read." He said that he was vomiting at night and had vomited blood twice; felt numbness, weakness, and stomach

pains; and had difficulty breathing. He said, "My only choice is to get out of here, either dead or alive." He also said, "Say hello to my family, if something happens to me, tell them forgive me."

28.     When I met with Mr. Wahab on May 3, he was skin and bones. His clavicle and shoulder bones stuck out. He said that he was now 144 pounds, having lost over 50 pounds since he began his hunger strike in early February. He stated that he had lost consciousness more than ten times and had been revived with IV drips of sugar or honey water. He also stated his body was very weak and that he had pains everywhere—chest, heart and stomach muscles—and suffered from a constant headache. He said that his vision was impaired, that he had no focus, that he had become forgetful, and that he was losing his memory of verses of the Quran. He said that he always felt cold, even when the temperature was high. He said his skin was now sensitive, and he indeed his skin was reddish all over.

**LOW ROOF CARGO VANS**

29.     Standard operating procedure makes travel between a detainee's camp and Echo or Delta difficult for a detainee under the best of circumstances. The hunger strike, leaving detainees weakened and dazed, magnifies the difficulty. The Joint Detention Group, which runs the prison, recently found a new way to make the journey even more difficult for a detainee.

30.     Detainees are moved from their camps to Echo or Delta, or other facilities, in windowless, white cargo vans, which outwardly resemble the 2013 GMC Savana 1500 Cargo Van. Detainees enter and leave the van through double doors in the back. According to my clients, the ride from the detainee's camp to Echo takes about 10 minutes but "much longer" to Delta and adjoining facilities. *See* Attachment A (satellite image of layout of camps).

31.     At the end of March, it appears, JTF replaced the regular vans with vans that have too little interior headroom to permit a detainee to sit upright, forcing him to ride the bumpy roads with his back and neck bent. Thus, a detainee wishing to meet with his lawyer or have calls

9

with his lawyer or family has to travel in a stress position, in addition to submitting to an

intrusive and humiliating body search.

32.     As I stated in the declaration attached to my request form for the SJA, "the

command had begun to use,

> in place of the regular vans normally used to take detainees to and from
> attorney meetings in Echo, vans with ceilings so low that the manacled
> detainee essentially [must] crouch while being transported to and from
> Echo. This is an unlawful stress position, and a substantial independent
> deterrent to [going to] attorney meetings.

I have been told by someone who made inquires to JTF officials that at least some of the low

roof vans were actually retrofitted regular vans.

33.     I learned of this new burden in a March 29 phone call, Abdalmalik Wahab (ISN

37) stated: "Today we came here in a new van, I had to bend down to fit into it." In our May 3

meeting, he elaborated:

> When I saw [the] van from the outside, it looked pretty good because there
> were steps [into the back of the van]. But then I saw the inside. I had to
> bend my back to go in and sit down—back bent, neck bent, in ankle and
> wrist shackles, and in a belt around my waist. The van took 10 minutes
> today, but to Delta, much longer. They never used this van before.

Abdalmalik also stated that to the soldiers "escorting" him in the low roof van can sit on the floor

without bending and extend their legs. He pointed out that the soldiers are not shackled.

34.     Shaker Aamer provided further detail, as recorded in Mr. Stafford Smith's

declaration dated April 30, 2013:

> The authorities are making it harder for prisoners to work with their
> lawyers. In addition to failing to follow their own procedures in telling the
> detainees in advance when they are getting calls, "they have brought a
> new humiliation transportation van." Shaker describes how the bench is
> high and ceiling is low so that you have to crouch near your knee to get in
> there. The whole van is blacked out so he can see nothing. "It is for
> midgets. The only human being who could sit in there is someone who is
> four feet tall." Shaker states that this is bad for the guards as well, as they
> are big people. The van has freezing air conditioning and neon lights.

Attachment C, Declaration of Clive Stafford Smith, page 2 (Apr. 30, 2013).

**OTHER SUBJECTS ADDRESSED BY CLIENTS**

35.     My clients also had much to say about other subjects beyond this declaration. They described the string of events leading to the hunger strike, all of which occurred after the current command took control of the prison last summer. In particular, I heard first-hand accounts of (1) the soldiers' invasion of Camp 6 in early September, (2) a tower guard's firing on a group of detainees in the recreation yard in late January, (3) the Quran searches in early February, (4) the raid on Camp 6 in mid-April, when the command moved all of the detainees to isolation cells; (5) the switch to transport vans that require detainees to bend over during rides between camps; and (6) the intrusive searches of private body parts, implemented in the first week of May, which has evidently led many detainees to refuse to leave their camps for meetings with their lawyers and calls with their lawyers. My clients also described other means by which the command is seeking to break the hunger strike by making the men's lives as miserable as possible, including sleep deprivation, temperature manipulation, interference with prayer, deprivation of such personal items as medical devices, toothbrushes, toothpaste, and towels; and even limits on the number of squares of toilet paper given to a detainee.

36.     One January 22, 2009, President Obama issued executive orders relating to Guantánamo closure, interrogation practices, and detention policy. Section 6 of his Guantánamo Executive Order 13492, "Review and Disposition of Individuals Detained At the Guantánamo Bay Naval Base and Closure of Detention Facilities," 74 Fed. Reg. 4897, 4899 (Jan. 27, 2009), is entitled "Humane Standards of Confinement." It stated:

> No individual currently detained at Guantánamo shall be held in the
> custody or under the effective control of any officer, employee, or other
> agent of the United States Government, or at a facility owned, operated, or
> controlled by a department or agency of the United States, except in
> conformity with all applicable laws governing the conditions of such

confinement, including Common Article 3 of the Geneva Conventions. The Secretary of Defense shall immediately undertake a review of the conditions of detention at Guantánamo to ensure full compliance with this directive. Such review shall be completed within 30 days and any necessary corrections shall be implemented immediately thereafter.

Pursuant to that directive, the Secretary sent Admiral Patrick M. Walsh to Guantánamo to determine whether detainees were held there in conformity with the specified applicable laws, including common article 3 of the Geneva Conventions.

37.     In his report, Admiral Walsh concluded that the operation of the prison conformed with the specified laws because, among other things, the searches "respect[ed] the detainee's groin area," as follows:

> Due to cultural sensitivities, modified frisk searching procedures are in place that respect the detainee's groin area, and guards are not allowed to conduct frisk searches of this area. Guards are limited to grasping the waistband of detainees' trousers, and shaking the pants.
>
> * * *
>
> Concerns raised in the early years of detention operations at Guantánamo highlighted the importance of respect for the religious traditions of the detainees. In response, considerable efforts were undertaken to avoid actions that could be construed as disrespectful. For example, guards are given awareness training and required to control noise and movement during prayer times. Guards have been disciplined for interfering with prayer time. A full-time cultural advisor has been employed by the JTF for the past several years. He provides a robust level of advice to leadership within the JTF, and most particularly, the [Joint Detention Group]. The [Commander of the Joint Detention Group] recognizes that the SOP does not permit searching of the Koran or detainee groin areas, which is contrary to standard security procedures in most detention facility operations, and that it carries a level of risk. However, he has accepted that risk out of an elevated respect for religious concerns of the detainees.

Admiral Walsh concluded that these conditions were in compliance with common article 3 and that conditions were humane.[2] The Walsh report leaves no doubt that the former command ran

---

[2] Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement 25–26 (Feb. 22, 2009).

the prison with a light touch. Under the command's approach, calm generally prevailed at the prison.

38.    All that changed when the current command assumed responsibility for running the prison in the summer of 2012. The new command's approach to running the prison is far different from its predecessors' approach. The new, punitive approach is described in a letter from DOD defense counsel and their civilian colleagues dated May 20, 2013. Attachment D. Since the arrival of the current command last year, there "has been a serious degradation in the quality of life for detainees," including "degrading body searches," solitary confinements, and disruption of prayers. *Id.* at 3, 5, 6. The new command's approach has shattered the calm that had prevailed since 2009, brought chaos rather than order to the prison, and led to a general hunger strike now in well into its fourth month, with devastating consequences for the desperate prisoners and no end in sight. The new command has reestablished Guantánamo as a symbol of American injustice and reignited demands that it be closed.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

*David H. Remes*

_____
DAVID H. REMES

DATED: May 22, 2013

# Attachment A



N

Camp Delta

Camp 6

Camp 5

Camp Echo

© 2013 Google
US Dept of State Geographer
Image © 2013 DigitalGlobe

Google earth

Imagery Date: 1/24/2010    19°54'07.50" N   75°05'54.82" W   elev    50 ft    eye alt   2000 ft

# Attachment B

COUNTY OF DORSET

ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, under oath, and deposes and states as follows:

1. I am an attorney licensed to practice law in the State of Louisiana, as well as the United States Supreme Court and various lower federal courts. I have been licensed to practice law since 1984.

2. I am a dual US-UK national. I have been representing prisoners in Guantánamo Bay since 2002, when I was working in Louisiana. I continue to represent a number of prisoners there.

3. On Friday, March 29, 2013, at approximately 11am EST, I spent ninety minutes on an unclassified phone call with my client Shaker Aamer, whose Internment Serial Number is 239. We spent most of the phone call on the subject of the hunger strike. I should note that I concentrated on matters that took place after my last call with Shaker, which took place on March 1, 2013.

4. Shaker gave me a detailed chronology of what is happening. I set forth my notes on our conversation on this subject below. When I use quotes, that is my best reconstruction of what Shaker reported being said, but it is clearly not verbatim. I regret that I have not, given the time constraints, been able to check my notes and my memory with my client, but I am confident that my notes are as accurate as I could reasonably manage.

5. February 6: The incident with the Qur'ans began the current problems at the prison.

6. February 7: The hunger striking began.

7. February 15: They came to Shaker's block in Camp 5. (Note that I am generally not allowed to identify cell locations on a call such as this.) They FCE'd him (this means that they conducted a 'Forcible Cell Extraction', which is the current euphemism for sending in what has been known as the ERF, sometimes called the Emergency Reaction Force). They FCE'd the two others there also. They FCE'd all three men during prayer time. All three were injured in the FCE assault. One of the three was rendered unconscious and was taken to the hospital, where Shaker understands that he remained unconscious for four days. He is still in the hospital today.

8. March 12: They came again to Shaker and FCE'd him during prayer time.

9. March 15: The sleep deprivation began. The guards on the night shift began a concerted effort to make sleep difficult.

10.     March 18: The sleep deprivation got much worse. Shaker was moved to another block, with another person who has been a striker for many years. Shaker was placed in the first cell on the block which is designated for disabled prisoners, and has not been used for several years. It is only a few feet from where the guards use the toilet, shower, eat and so forth.

11.     The female psych who calls herself 'Helena' came to see Shaker. He had just been moved to the noisy cell, and she asked him whether he planned to "harm himself"? He does not talk to those among the psychs who are only taking part in the abuse, so he did not initially respond to her. However, she went on to say that guards had reported that he wanted to harm himself. Shaker did reply then, as he did not want this excuse to be on the record for further abuse of him. "I have a wife and kids and I expect to be released sometime in the near future as I have been cleared for more than five years. It is not me who wants to harm me, but the Administration that is harming me."

12.     Shaker lodged a complaint with her about being in the new cell, as it is made for a disabled person ("I am not disabled yet"), and is too noisy for sleep. He pointed out that if the guards were genuinely concerned about him self-harming, there was an observation cell half way down the block with a plexiglass door where they could monitor him 24 hours a day, and where he might be able to get some sleep. 'Helena' said to Shaker that this was "not my business." Shaker replied that it clearly was – he was being abused and denied sleep. She has not returned since that time.

13.     March 19: Adel Hakeemy (ISN 168) from Tunisia, also a *Reprieve* client, attempted suicide. He was being held where Shaker "used to be." (I understood this to be Camp 5 Echo, which is the most abusive of all the cell blocks in the camp – Shaker has detailed the mistreatment unique to this block in our earlier conversations). Hekeemy was taken to hospital and only returned on March 28. He has been brought back to Camp 5 Echo again, which is obviously the worst thing they could do with a detainee who has been self-harming. Shaker asked that we get something done about this as soon as possible.

14.     March 19: Shaker lodged an official complaint with the OIC about the sleep deprivation. He pointed out that he suffers from tinnitus and that they have known for many years that he is a very light sleeper and has sleeping problems. There are 12 empty cells in the block, so he could be moved to any of them and the noise problems would be at least reduced. However, as of March 29, there has been no response to his complaint.

15.     March 19: Shaker reports that there is a new "Code Matrix" being used in the camp (i.e., Code Yellow means that someone has collapsed from the hunger strike, Code Snowball means that someone is committing self-harm, Code Orange Crush is where there is a open door for some unauthorized reason, and Code Matrix is apparently what they are using to avoid cameras and FCE teams). The evil impact of these codes is that the guards rush in and assault people without the normal cameras that are used with the FCE team (which, in theory at least, record what is done to the detainee).

16.     One prisoner was subjected to the new Code Matrix for being "in possession of a bottle of water" and was beaten up without cameras.

17.     There is also a new practice that has been brought in which involves using a dog leash on the detainees. Normally, they would have the hand and leg shackles (which are still in use) and the hands would be held by a guard from behind as they walk (or, more generally, push) the detainee along. But now they are attaching a cloth dog leash to the waist chain, clipping it on as they might an animal. A sergeant tried to make Shaker a victim of a Code Matrix today when Shaker refused to have a dog leash, and be treated like an animal. However, in the end they backed off and went for the FCE team.

18.     The authorities have begun a concerted campaign to FCE prisoners in a more abusive way. Shaker had been conducting the non-violent protest that he has done for many months (sitting in the rec yard and asking to stay there for a week as a protest against the fact and conditions of his confinement; on this day, Shaker added the demand that he should be moved out of the noisy cell as well). This non-violent protest is essentially the only protest available to Shaker. For the months gone by, the FCE has been done the regular way, but they have now started a new method, which is being applied to all prisoners except those being taken to hospital.

19.     The new FCE method is as follows: they no longer use the board, but they have six large people who come into the area where the detainee is and shackle his feet, and his hands behind his back. They then lift him up "like a potato sack" and simply carry him to where he is being taken (in Shaker's case, through six or seven doors, about 150 yards to his cell). This is excruciatingly painful, particularly because of Shaker's long-term back injuries (which were originally caused by mistreatment by the US in Bagram Air Force Base).

20.     March 19: Two Generals came to visit Camp 5. (Shaker believes, but cannot be sure, that one was a Gen. John F. Kelly, currently head of Southcom.) There was an entourage with them. Just before they arrived, an ambulance pulled up outside the camp, with doctors, nurses and a stretcher. They were in civilian clothes. They had all sorts of equipment, including an oxygen tank. They loaded a man with a light beard who was *not a detainee* on the stretcher. He had no cuffs, but was just strapped down to the stretcher so that he would not fall off. They carried him out to the ambulance in full view of the generals, and drove off towards the hospital. This was all an act for the generals to try to impress them with how good everything was. (Shaker believes that, if challenged, the authorities would state that this was a normal thing – perhaps a training operation.)

21.     Shaker reports that visitors are coming by the camp every two or three days, as there is a concerted effort to convince people that treatment is fine. In truth, in the daytime it is much quieter, as it is mainly at night that the worst abuses happen.

22.     "The Night Shift are back on 'Miller Time' [what Shaker calls the behavior and strategies of General Geoffrey D. Miller, in 2002-03]. They are stomping up and down the tier, talking, singing (one woman in particular), doing the garbage, banging the doors which are hydraulic and make a very loud slamming noise 20 or 30 times a night, dragging chair around, crashing about with the ice chest. They have brought a big fan back to make noise."

23.     It is clear to Shaker that there are particular orders for the Night shift to do all this. For example, only the Night Shift does not use the board; the Day Shift still does. Shaker demanded why they were not using the board to carry him after

3

what the doctors had said about his back. He was told that there was no rule requiring them to use the board.

24.     Shaker has a good relationship with some of the guards, and NCOs have told him that they do not want to do it but they have to.

25.     Shaker is also concerned that they are doing all they can to cover up who is committing the worst abuses. The number system was instituted seven years ago or so in order to allow the prisoners to report abusive soldiers. 5arious strategies are being used to prevent this now. Although he got the number of one person (the 300 lbs man), by and large he cannot get the numbers of FCE teams as they are wearing white coveralls that obscure their numbers. The guards are also changing their numbers and recycling old numbers from the past.

26.     Shaker reports hearsay (it was said by the Colonel to one of the other prisoners – who does not want his name reported for fear of reprisals) that the Colonel said: "I will bring this camp to how it was in the old times. I've got kids at home and I know how to deal with kids." Shaker is worried for the Colonel's kids, as there may be a need for social services to check on how they are being treated.

27.     During the visits by outsiders, even in the day time, there are various strategies being used to cover up what is happening. Normally, Shaker reports, the food that was not used was left outside. Now, it is being put in the insulated containers in the block, to hide the fact that the detainees are refusing to eat it. This may, he thinks, also be done to make the smell of food lure more prisoners to go back to eating.  Then all the unused food is thrown in the trash, so that the civilians who make it get the food containers back empty, and again cannot report on how much is not being eaten.

28.     The Colonel has ordered other abusive tactics. Shaker understands (and the detainees believe) that the Colonel was deployed to Iraq or Afghanistan before coming to Guantánamo Bay, and is therefore taking a tough attitude, because that is what they apparently did there. He is only issuing half-isomats (three feet long rather than six) and so forth.

29.     March 20: Shaker complained to the medical corpsman about his abuse on March 19, and so today he was carried on a board, since the medical officers said that the new method of FCE'ing was not permissible with Shaker because of his back injury.

30.     March 21: Today, and at all times since, they have reverted to the new method, and have refused to use the board. Indeed, today they introduced a new abuse on top of this. When the FCE team came in to get him, a particularly large soldier, who weighed about 300 lbs, kneed him in the back and held Shaker down with his full weight on top of him. This caused bruises on his back and hands. Shaker showed these to the corpsman, who said he would write it down and follow it up. However, nobody came to see him about his new injuries and nothing has been done.

31.     March 22: This abusive FCE was repeated, with the 300lb soldier. Again he was bruised by the man, and he took down the soldier's number. This time, they held his hands and his legs, both crossed over, and the man pushed down until Shaker heard a cracking sound in his own back.

32.     Shaker was not permitted to give me the soldier's number on an unclassified call.

33.     When Shaker sought medical treatment for this injury, he was offered Tylenol. "This is not a reasonable response for that kind of injury," he said to me.

34.     March 23: Shaker began refusing to go out of his cell, as he is very worried about being paralyzed in the same way as the Egyptian and the Syrian, who were paralyzed by the beatings that they got in Guantánamo Bay. (Note: the Egyptian was Sami al Laithi, ISN 287, represented by *Reprieve*, who was paralyzed when beaten in the hospital.)

35.     March 25: At 14:05 today Shaker was visited by 'Dr. Cordelia', who is one of the pleasant medical personnel. She said he was now recognized as a striker, though they had refused to accept that before. She told him the impact of the strike, reading off a piece of paper about how his kidneys might fail, he might go blind, he might cause permanent brain damage, and so forth. She said that he needed Thiamine, medication for his muscle spasms, and nutrients like honey and ensure.

36.     Since March 25, Shaker has been visited by a doctor or a nurse every day. However, they are doing nothing. He has lectured them all on how they are violating their medical ethics by taking part in the gratuitous mistreatment of the prisoners, but they have told him that they are following "orders from on high."

37.     March 29: 0400 they did a Code Matrix on one of the skinniest hunger strikers (now 107 lbs) who had a Tupperware box with him. He had tea in the box and they did a Code Matrix call on him. In the end, rather than be beaten up he gave it over to them.

38.     0915 With his phone call, they did not tell Shaker the night before as the rules require. They told him only at 9:15am that they would be coming immediately for him. As a result he had not been able to prepare to tell counsel about the details of what was going on. However, there was an "operational delay" in the call – which Shaker reported as being a flat tire on the van – which allowed him time to gather his notes up and prepare to speak with counsel.

39.     "Last night was one of the worst," Shaker reported. A Hispanic female was singing much of the night. The noise from next door in the toilet was constant and loud. Shaker got almost no sleep.

40.     Shaker has lost 32 lbs as of today. This is necessarily an estimate as he is not being accurately weighed, but he considers himself an accurate judge of his own weight after the hunger strikes he has been on. His hand is shaking almost permanently because of the hunger strike.

41.     Shaker has been badly punished for joining the strike. He has been denied various things that were ordered for medical reasons including his second isomat (for his back), his blanket (for arthritis), his knee brace (for his knee injury), his back brace for his back problems), and the pressure socks that are meant to help with the edema in his feet. He even went ten days without being allowed a toothbrush.

42.     He has also been denied the medically ordered second bottle of water. In Camp 5 (as compared to Camp 5I, where apparently bottled water has been cut off

altogether) there is a new rule that they are only allowed one bottle at a time – whether they are using it for coffee, for washing for prayer, or drinking.

43.     All the spices that Shaker had collected were thrown out; apparently there is a policy of throwing out the spices that detainees got through the ICRC.

44.     There is currently a policy of nobody in authority talking to prisoners about their complaints. Shaker has asked to see the OIC, the AOIC, and so forth, but none will come, as the NCO reports them as saying it is not their responsibility.

45.     As of March 29, Shaker reports that there are 130 prisoners total on hunger strike in the whole prison. Of the 66 prisoners in Camp 5, 45 are recognized as being on strike, though more actually are doing it (Shaker was only recently recognized himself). Shaker reports that 15 of them have blood sugar levels below 40 mg/dl. There is one prisoner with a blood sugar level of 17 mg/dl. Seven detainees are in hospital.

46.     The authorities are playing with the prisoners' weights. They use the big scale now, and they weigh the prisoner with shackles, and often immediately after they have drunk a lot of water. They hide the weight reading from the prisoners, so there is no saying what is written down, though they sometimes say what it is. Shaker reports various 'miracles': With one prisoner, who weighed 127 lbs last week and has not eaten in the interim, they said he was 140lbs.

47.     Shaker understands that one detainee is reportedly 85 lbs; another 107 lbs; and a third 117 lbs.

48.     Shaker estimated that he is 158 lbs, down from around 190 lbs when this began. "You can see the bones in my chest. My body has taken a lot of shock." He is taking two or three spoons of honey a day to try to ameliorate the worst impact of the strike on himself, as his body had suffered a great deal of damage over the past eleven years.

49.     Between six and ten detainees who are 'falling down' every day. They are told that this is because their blood sugar levels are between 20 and 40 (mg/dl). If this happens, they are being strapped to the board, and told that they have to take a mixture of honey and water. They may be left on the board for several hours until they agree to take the honey and water. They are using this method rather than the tube and the chair.

50.     Prisoners are being mistreated in gratuitous ways, in addition to the mistreatment of Hakeemy (ISN 168). For example, the paralyzed Syrian has been denied his wheel chair for 6 weeks now. He is being isolated in Camp 5 Echo and he is there without his chair.

51.     Notwithstanding this, Shaker reports that the detainees are more together than ever they have been, as they are determined to fight the abuse they are suffering through a non-violent hunger strike.

52.     While I would obviously prefer that Shaker Aamer should be permitted to testify to the facts that he related to me himself, the foregoing is as accurate an account as I am able to produce from my notes of my conversation with him about the current state of the hunger strike in Guantánamo Bay, and the unfortunate response by the authorities to it.

I declare under the pains and penalties of perjury under the laws of the United States that the foregoing is true and correct.

Done this 31st day of March, 2013.

Clive A. Stafford Smith

# Attachment C

COUNTY OF DORSET

ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, under oath, and deposes and states as follows:

I am an attorney licenced to practice law in the State of Louisiana, as well as the United States Supreme Court and various other inferior U.S. courts. I have been licenced to practice law since 1984.

I am currently the director of the London-based legal action charity, *Reprieve*. I am a dual US-UK national. I have been representing prisoners in Guantánamo Bay since 2002, when I was working in Louisiana. I continue to represent a number of prisoners there.

On Thursday, April 11, 2013, at approximately 9am EST, I spent sixty minutes on an unclassified phonecall with my client Shaker Aamer, whose Internment Serial Number is 239. We spent most of the phonecall on the subject of the hungerstrike.

Shaker gave me an account of much of what is happening. However, we were only allowed to talk for sixty minutes, and it would have taken much longer to conclude what he had to say.

Shaker said he was very willing to appear as a witness before Judge Hogan.

I set forth my notes on our conversation on this subject below. When I use quotes, that is a direct or very close reconstruction of what Shaker actually said. My notes are much more accurate in this account than others, as I set up the phone so I could type almost verbatim notes. Despite this I regret that I have not, given the time constraints, been able to check my notes and my memory with my client, but I am confident that my notes are as accurate as I could reasonably manage.

Shaker began by telling me that nobody told him about the impending call. He was woken up shortly before nine am and hustled over. As a result, he did not have the materials he needed.

Shaker was not allowed writing implements for some time, so he was unable to take notes of things, but another prisoner on his block has been taking notes for him where necessary. "I was going to bring it all with me. My brother across the hall has been registering all the things when I have had no pen, no paper, no books, no medical materials…"

Shaker did get paper yesterday [April 10] for the first time in a while, but did not know that there was a call today (he was not given the 24 hours notice that he is meant to get). So he had not done up notes, and did not have the chance to get what the other detainee had done for him.

The authorities are making it harder for prisoners to work with their lawyers. In addition to failing to follow their own procedures in telling the detainees in advance when they are getting calls, "they have brought a new humiliation transportation van." Shaker describes how the bench is high and ceiling is low so that you have to crouch near your knee to get in there. The whole van is blacked out so he can see nothing. "It is for midgets. The only human being who could sit in there is someone who is four feet tall." Shaker states that this is bad for the guards as well, as they are big people. The van has freezing air conditioning and neon lights.

Shaker is being punished as a consequence of his calls with his lawyers. "Each phonecall [from a lawyer] is a curse," Shaker said. "I receive harsh treatment that day. As soon as I came back various things change. They hear what I am saying to you and use that against me to make things worse. That is the sad thing about the phonecalls."

Shaker reported being FCE'd (subjected to a Forcible Cell Extraction) for almost everything now. "On [April] the 8th, there were 20 FCE's in the whole of Camp V, and three of them were me."

Shaker was FCE'd when he demanded his legal materials back. "After my last call with you, my lawyer, they took everything. I took rec that day as I had not been there for a while. When I came back in everything had been thrown in the cell, like garbage. Papers were all over the floor." They had taken everything in Shaker's cell, his legal materials, his other documents, "even my kids' drawings. They ripped them off the wall."

"They took all my medical stuff." The guards took his two isomats, his pillow, his 'donut' that the doctors ordered for him to sit on his hemorroids, his back brace and so forth.

"I was complaining. The guard said it was not him [who did it]. I tried to collect the papers together, but lots of things were missing. I complained to the SJA who said 'I will see what I can do.' Then they FCE'd me and brought some things back to me."

When supposedly everything had been returned, Shaker noticed pages missing from his legal documents and so forth. "The SJA came back and said: 'They [the guards] say they took nothing.' The SJA asked what was missing. How can I tell precisely what they took? There were 3000 pages." However, Shaker went on to describe how pages were missing on numbered documents (it would go 1, 2 and then be missing 3 and so forth).

Shaker is being FCE'd for water. "For three days now if I say I want more water – they FCE me just to give me water. The first day I got FCE'd three times and Code Yellow two times [when Shaker fell down unconscious]. Not even General Miller did this during 'Miller Time'."

They are FCE'ing Shaker for essentially everything. Yesterday [April 10] is an example. "They FCE'd me at 2pm to bring in lunch." This, even though Shaker was on hunger strike and was not going to eat it.

"I asked for thiamine and 60ml honey [and other medications], as the doctor said it was necessary. They FCE'd me. The Corpsman came in. 'You FCE'd me for medication?' [Shaker demanded.] The Corpsman said, 'That's the only way they will let you have it.'"

"They would not take the lunch away. They left it until dinner time." This is apparently torturous for Shaker since he is on hunger strike and they are just trying to make him have food in his cell for hours.

Shaker asked for water. "They would not bring water until dinner time."

Then: "They FCE'd me last night at 945pm to bring the dinner inside, even though I was not eating."

Shaker has had almost no water for 24 hours as they would not bring water. "The nurse registered this. I made a declaration to the nurse." Shaker reports that she has no number; the guards, corpsmen and nurses now use what appear to be pseudonyms which Shaker thinks are Shakespearean names. This makes it impossible for him to identify them.

Shaker reports that nurses and corpsmen are saying they can do nothing about water as that is for the guards. Shaker told them he is a trained nurse, and showed them the froth on his saliva, and asked: "What does it mean?" They told him to drink from a sink. They said it is potable. Shaker won't drink it. "Look at the color of the water."

[*Note: I told Shaker that I have a recent photograph of one of the sinks at Guantánamo – where lawyers stay, rather than in the camps - which says clearly above it:*

*"Non-Potable Water*
*Please do not consume*
*Safe for washing"*

*I will enclose it with this declaration.*]

Shaker said he would sue them all when he gets out. However, they are not intimidated by this because he is unable to identify them. [*Note that the agreement from several years ago was that the staff would wear numbers for precisely this reason – so that the prisoners could bring complaints against those who violate their rights.*]

Shaker reports that he has only been able to drink a sip of water since last evening.

Shaker has been refusing blood tests, the heart EKG, and so forth. He would have to accept being FCE'd to have this kind of testing at the moment anyway.

The guards told Shaker that they would FCE him if he wants to go to Rec.

"I have not showered for more than 9 days. They say they are busy. I will have to do it from the toilet as I was forced to one time before."

Shaker is losing weight faster now than before. "In 11 days, I have lost more weight than before and I am around 150 lbs." Shaker believes that the stress from being FCE'd so much is making him drop weight fast.

Shaker reports that he is not able to get medical attention without being beaten up. "239! Do you need medical attention 239?" says the corpsman.

"I ask for water; you bring me FCE," Shaker replies. "I ask you for food; you bring me FCE. I ask you for rec; you bring me FCE. I ask you for medication; you bring me FCE."

Every time the FCE team (or even the medical Code Yellow team) come into his cell Shaker is getting injured. "I am getting scared because one of the guards stepped on my foot yesterday. I have bruises all over. The guy yesterday did not do it intentionally, they came running, it is a cell for disabled people, it is very tight. They fall on me, as I lie on the floor."

"I have bruises on my legs, knee, my arms where they carry me, as there is still no board. If we were on Skype you could see them. I think I bruise more easily now because I am not eating."

I asked Shaker how he feels through all this FCE mistreatment. "Thee is the tramp to the door, they smack the door … even if you are used to it, your adrenaline rushes, your heart starts beating. I know that something is going to happen to me, it's scary. It is like a car race going 180 miles an hour, with a wall in front of you, you know that the brake might not work, you panic."

"I can't read. I am dizzy and I fall down all the time. I do not call them, as it is humiliating. When they call Code Yellow, they step on your fingers, your hands, they scratch you, even then you are living in fear when they say they are treating you. Yesterday they tied me on the board and they threw me in a cell because the medical people were busy. So they only took me to another cell. You are lucky if you get a medical space."

Shaker reports that Code Yellows (when a prisoner collapses or passes out) in Camp V are now running at 10 to 15 times a day.

"My back and my neck are getting worse day by day. I don't want the end of this torture here to be paralyzed. I want to carry my kids when I get home; I don't want my kids to have to wash me. I don't want to be the third one paralyzed in this place."

I asked Shaker what effect it was having on him mentally to be hungry all the time. He described the hunger in general terms and then got more specific. "I try to go to sleep early in the night. Then you feel as if you have just died. I wake up at 5am to prepare for prayers. I have not had any rest, I feel I just went to sleep and was immediately woken up. I pray around 530am and then try to go back to sleep. I stay trying to sleep until they wake me up again just before 9am."

Shaker noted that he is still in the very noisy cell next to the guards [*as described in detail in my declaration concerning my last conversation with him*]. The guards have orders to do this. "I know the guards who try to be human beings, and they tell me that they cannot do anything."

There are other ways in which Shaker and others are being kept from sleeping [*in addition to what he described in my last conversation with him*]. "Nobody has an earpiece any more. We live in the radio traffic now, with constant loud commands coming over the radios, loud and clear all over the camp [Camp V]. This did not happen during Miller Time."

"For a whole week one female guard bothered us during the prayer. Before prayer we ask them to shut their radios, and so forth. But they carry on talking, pushing things around. But there is nothing left to us but our prayers."

Shaker reports that the physical conditions are bad, perhaps exacerbated by the weak conditions of the prisoners on hungerstrike. "In the night people are dying from cold. In the day they are dying from the heat. People cry from the heat and the humidity. I could not put the prayer schedule on the wall because it was so damp. It is systematic torture."

Shaker is not yet being force fed. He reports that the Administration are not doing force feeding to a number of people who have lost a lot of weight. Some people who are no more than 100 or 104 lbs are not being fed. "One detainee has lost 55 lbs, more than 25 percent of his weight, and they told him that he is now looking good."

Shaker would like to send several messages to President Obama:

> * "If you are an honest man, send the same team as you sent down as a committee [to assess who should be cleared] to meet the detainees now and see what is really happening. The people visiting are mostly from the Department of Defense, and they are all seeing something like a movie [to make things look good]. No prisoners can talk to the visitors."

> * "You need to hand over the 86 people who have been cleared."

> * "You need to send a team from the UN. If you are not scared of what they will see, get someone to come in. Or send someone from your closest ally – England. They will be shocked and horrified to see the situation."

> * "In the end this place has no solution except close it down, or transfer it to the UN and let them run this place. Or send all of us to the Hague for trial in the International Criminal Court. Say, '239 agrees to go to the ICC in the Hague'. They will laugh [at the Hague] because they know I am not a criminal."

Shaker instructed me to write a letter immediately to the British government concerning his treatment. He said he is going to refuse everything, if he is required to be beaten up by the FCE team to get it. "I am not taking more water or medication if they FCE me each time. I will take it if they want to give it to me correctly and fairly.

But I would rather die one time, than die fifty times."

Shaker coughed really badly twice during our phonecall – he reports that he now has a chest infection that is making his other medical complaints worse. Also, on two occasions Shaker started laughing hysterically, which prompted my concern. At the end of our conversation, he appeared to be crying, or very close to crying, which is very unusual for Shaker, for he is a proud man who does not like to show weakness. However, it was clear that he genuinely fears dying in Guantánamo now, and he made me promise to deliver a message to his wife if the worst comes to the worst, and he does not see her again.

"It's hard to keep calm. They are killing us, so it is hard to keep calm. It is hard to understand what they are doing or why."

"No matter how much I show you I am tough, in reality I am dying inside. If you want us to die, leave us alone. But they do not want us to die, and they do not want us to live like a human being. What is worse than that?"

"I might die this time, I cannot give you numbers and names, but people are dying here. I cannot give you the details." He said that when he has paper he will try to write this down and send it to me in a letter [though this can take weeks to get to me].

I declare under the pains and penalties of perjury under the laws of the United States that the foregoing is true and correct.

Done this 11th day of April, 2013.

Clive A. Stafford Smith

6

# Attachment D



**DEPARTMENT OF DEFENSE**
**OFFICE OF THE CHIEF DEFENSE COUNSEL**
**1620 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1600**

20 May 2013

The Honorable Charles Hagel
Secretary of Defense
Office of the Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301

   Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

Dear Secretary Hagel:

   We are uniformed officers and civilian counsel representing prisoners in U.S. custody at U.S. Naval Station Guantánamo Bay.  We have been appointed by statute to assist some of these men before the U.S. military commissions, and accordingly, have a duty to ensure the U.S. Government discharges its obligations faithfully under controlling authorities, such as the Geneva Convention and the U.S. Constitution.  Although we represent so-called "high value detainees," many of our concerns relate to the treatment of all prisoners, to include the men whose internment appears to be indefinite.

   You are no doubt aware of the sheer state of desperation of the majority of men interned there, who the *New York Times* editorial board has just recognized are political prisoners caught in the middle of a stalemate between Congress and the President.[1]  While the hunger strike continues to increase in scope and severity, there is much you can do, right now, to improve the quality of life for all the prisoners.  We are writing to offer our assistance, and recommendations on how you may improve their quality of life before it is too late – before many of the "wrong place, wrong time" detainees achieve freedom, not through the rule of law, but through death by starvation.

   We are writing you directly because our prior letters to the Department of Defense have been ignored, similar to the prisoners' pleas.  Positively, we note that under your leadership, there appears to be an increased concern about the welfare and situation of the prisoners.  Specifically, we think it is a step in the right direction that you directed William Lietzau, Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy, to respond to concerns addressed by habeas counsel for dozens of detainees.[2]  This is an

---

[1] NY Times, Editorial Board, "The Guantanamo Stain," 25 April 2013, (http://www.nytimes.com/2013/04/26/opinion/the-guantanamo-stain.html?_r=0)
[2] The Center for Constitutional Rights (CCR) and associated habeas counsel sent you a letter on 14 March 2013 to alert you to the pressing humanitarian problems at JTF-GTMO affecting the 166 detainees.  Specifically, the letter detailed how the deteriorating conditions of confinement, deleterious change in command philosophy, and the prospects for indefinite detention have sparked the current hunger strike – which as of today, officially includes more than 100 detainees and rising.  It is apparent that you directed William Lietzau, Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy, to respond to the 14 March 2013 letter from CCR.  Mr. Lietzau responded by letter on 1 April 2013 to CCR. While we regret that Mr. Lietzau's response did not fully address the concerns of CCR, we note that under your leadership, at least CCR received a response – a courtesy that has not been extended to uniformed counsel since March 2009.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

improvement as prior letters (totaling 12) from uniformed defense counsel to the Department of Defense have been ignored repeatedly since March 2009.  (See Enclosure 1, Ltr from Counsel to Mr. Lietzau, Denial of Minimum Guarantees of Common Article 3 at Camp 7, dtd. 24 Feb 2012).

As with prior submissions to Mr. Lietzau that have been unanswered, we are writing you to request that you direct critical attention to our pressing concerns.

I.  <u>Request # 1:  Request for Constructive Engagement</u>

We respectfully request that you take immediate measures to consider and respond to our concerns.  As noted above, on 24 February 2012, uniformed defense counsel and appointed civilian counsel wrote to Mr. Lietzau on behalf of prisoners interned at Camp 7 to request that he undertake an appropriate investigation of reportable incidents of violations of the law of war, fulfill the recommendations outlined in the 2009 Review of Department Compliance with the President's Executive Order on Detainee Conditions of Confinement (aka Walsh Report), and correct any violations to ensure humane treatment consistent with Common Article 3 of the Geneva Conventions. (See Enclosure 1).

To date, Mr. Lietzau has not responded to this letter of 24 February 2012 or any of the previous twelve (12) letters submitted to him since March 2009.  The concerns raised on 24 February 2012 have not abated, but have become elevated based on a serious change in command philosophy – one that pursues punitive detention as opposed to preventive detention contrary to established customs governing the laws of war.

Regarding the current hunger strike for instance, JTF-GTMO responded by "disciplining" internees by placing the majority of them in solitary confinement following a raid with force at Camp 6 on 13 April 2013. The raid came shortly after a delegation from the International Committee of the Red Cross completed a three-week visit to examine the prisoners and study the circumstances of a hunger strike that had been embroiling the camp for weeks.[3]  As you are aware, the ICRC flew out on Friday and the raid took place on Saturday.  Since then, according to JTF-GTMO figures, the number of hunger strikers has increased by more than 100%, from 43 to 102, the number of strikers being forced fed increased from 13 to 30, and the number of hospitalized hunger strikers increased from 0 to 1.[4]

Death – whether by suicide, starvation, organ failure, or associated complications – is imminent.  We request therefore, an immediate response from Mr. Lietzau to our 24 February 2012 letter, and a description of any actions that were taken by the Department of Defense to examine the matters raised therein, such as whether a law of war investigation was initiated consistent with U.S. law and policy.

---

[3] NY Times, "Mounting Tensions Escalate Into Violence During Raid at Guantanamo Prison," 13 April 2013. See http://www.nytimes.com/2013/04/14/us/violence-at-guantanamo-as-guards-try-to-move-inmates.html?_r=0 (Last accessed 27 April 2013.)
[4] See http://www.miamiherald.com/static/media/projects/gitmo_chart/ (Last accessed 20 May 2013).

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

II.  <u>Request # 2:  Examine the Fitness of COL John Bogdan for Command</u>



There has been a serious degradation in the quality of life for detainees in Guantánamo Bay over the past year.  This change appears to have coincided with the arrival of the new Joint Detention Group Commander, COL John V. Bogdan.

An independent investigation by the Center for Policy and Research at Seton Hall has determined that COL Bogdan may have perjured himself under oath before the military commissions in *U.S. v. Mohammad*.  This independent report, entitled "Spying on Attorneys at GTMO:  Guantánamo Bay Military Commissions and the Destruction of the Attorney-Client Relationship," focuses on the recently uncovered evidence of governmental misconduct involving the unlawful and surreptitious monitoring and recording of privileged attorney client communications at the Guantánamo Bay Prison.[5]  Notwithstanding the crippling impact the spying revelation has on the effective assistance of counsel and the right to a fair trial (grounds alone which would justify appellate reversal of any military-commissions conviction), this independent report outlines the inconsistencies and contradictions in the many versions of JTF-GTMO commanders' and staff officer's testimony and statements regarding the purpose and capability of the listening devices that were disguised as "smoke detectors" in the attorney-client meeting rooms in Echo II (See photo above):

> Even after multiple layers of deception were peeled away, the government provided a series of inconsistent explanations about the extent to which eavesdropping between attorneys and their clients has been taking place in Camp Echo:
>
> - No audio monitoring equipment existed.
> - The audio-monitoring equipment existed.
> - The audio-monitoring equipment existed, but an oral instruction prohibited personnel from using it.
> - The audio-monitoring equipment in place was never used.
> - The audio-monitoring equipment was only used for limited purposes.
> - The audio-monitoring equipment was rendered inoperable.
> - The audio-monitoring equipment was discovered to be broken.
> - The audio-monitoring equipment was repaired.

---

[5]  See http://law.shu.edu/ProgramsCenters/PublicIntGovServ/policyresearch/upload/Spying_on_Attorneys_at_GTMO.pdf (hereinafter Seton Hall).

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

- The audio-monitoring equipment was upgraded.
- The person responsible for authorizing the repair and upgrade of the audio monitoring equipment [COL Bogdan] was unaware that the equipment existed.
- The audio-monitoring equipment did, in fact, exist and function but the power supplies were removed once the defense attorneys discovered it.

(Seton Hall, pg. ii-iii).

According to the independent investigation, "[t]he JTF-GTMO command staff's contradictory statements under oath about Echo II's audio-monitoring capabilities raise the question of what the truth of Echo II's history is." (Seton Hall, p. 9). Regarding COL Bogdan's suspect testimony under oath, the report highlights his problematic testimony:

> Around the first week of December 2012, Echo II cameras were upgraded "from an analog to a digital capacity." The upgrade was at J2's request and under Colonel Bogdan's knowledge and authorization. The upgrade was necessitated in part by a refurbishment project on all huts in Echo II, undertaken in October and November 2012, during which time several wires in the audio surveillance system were cut inadvertently.
>
> When the officer in charge of Echo II learned that the surveillance system had been damaged, he requested for the audio wires to be repaired, but Colonel Bogdan maintains that he first learned that there even was an audio surveillance system in Echo II in late January 2013. *Thus, Colonel Bogdan authorized the repair of a state-of-the-art audio component of a campwide surveillance system: a component that he claims he did not know existed and was not even used.* But someone or some group not only knew that the audio surveillance equipment existed, they must have tried to use it in order to learn that it did not work. As of early February 2013, the audio surveillance capability was functional in huts 5 through 8, but not in huts 1 through 4.

(Seton Hall, pg. 18) (Emphasis added).

   It is undisputable that once the audio capability had been restored to 8 of the 16 attorney client meeting rooms, JTF-GTMO only permitted meetings to occur in those huts that were wired for sound, unbeknownst to the attorneys and prisoners. In response to the evidence presented, the military judge ordered JTF-GTMO to immediately dismantle the listening devices, which had enabled the monitoring of attorney-client meetings at Guantánamo Bay.

   This is prospective relief, and we hope to have the full cooperation of the Department of Defense and related agencies as we continue to investigate the full extent of the prior monitoring for later resolution by a competent authority. Nonetheless, we raise the issue COL Bogdan's fitness for command to your consideration now. While Seton Hall's finding are sufficient grounds to examine COL Bogdan's fitness to command the Joint Detention Group, his leadership should warrant further scrutiny based on the rapidly deteriorating detention conditions under his command and his heavy-handed response to the current hunger strike.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

III.  Request # 3:  Cease the Daily Searches of Legal Bins and Excessive Bodily Searches of Detainees at Camp 7

   Current practices at Camp 7 with respect to so called high value detainees are interfering with critical and essential defense functions.  JTF-GTMO's recently arrived guard force has adopted procedures that can only be construed to purposely and systematically harass prisoners.  These procedures include daily cell shakedowns and tossing's of prisoner's cells.  Prisoners are subjected to degrading bodily searches even when no rational basis exists for such procedures.  In one instance, a prisoner who had not left his cell for weeks due to a debilitating health condition, was nevertheless forced to exit his cell every day so that the guard force could toss his cell and search his person.

   Recently discovered evidence that will be submitted to the Commission under seal also reveals the systematic seizure of attorney-client privileged materials by personnel at the high value detention facility.  These materials include attorney client notes written for the client's benefit as well as confidential letters delineating trial and motion strategy.  The Staff Judge Advocate in charge of high value detainees has disavowed any knowledge of the purpose for the seizure or the persons directing these seizures.

   We are requesting that you order an immediate investigation into the identity of the persons responsible for ordering these seizures of attorney-client privileged materials as well as the purpose for the seizures.

   This systematic pattern of harassment, degradation, and unauthorized seizures of attorney client privileged materials has degraded the trust and respect necessary to establish and maintain an effective attorney client relationship.  These unprecedented violations destroy the prisoner's confidence in the confidentiality and sanctity of defense work product and discourage them from leaving their cells to attend meetings with their attorneys since their cells are tossed whenever they do so.  While "routine" searches within the Federal Bureau of Prisons systems are permitted, "daily" searches of this nature do not occur.

   As you may be aware, the next Commission's session is not scheduled until 17 June 2013 due to the recent delay occasioned by the disappearance of large segments of defense work product on network servers and the controversy surrounding the dissemination of over 500,000 e-mails to the prosecution, including attorney privileged communications.

   We therefore request that you immediately engage JTF-GTMO on this matter and ensure that their actions do not continue to impact the defense function before the next session of the military commissions.

IV.  Request # 4:  Screen all Present and Future GTMO JTF, JDG, and Camp Commanders for Bias, Prejudice, and Proper Temperament

   The points raised above highlight the necessity for the Department of Defense to examine the fitness of future commanders and screen for bias and prejudice.  This evaluation of temperament is necessary to determine whether the commander is able realistically treat the prisoners humanely and set aside any bias or prejudice.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

Recent command actions that defy justification, such as placing hunger-striking prisoners in solitary confinement, camp-wide temperature modifications, and guard disruptions during attempted prayers, find their roots in prejudice.  The first-hand account of an Afghan villager-prisoner, detainee Obaidullah (ISN 762), concerning the degradation in treatment standards has been published and cleared for release.[6]  Within hours, Obaidullah's account has now circulated in many languages around the globe and brought additional scrutiny to the deteriorating quality of life for the prisoners.  The World Medical Association rejects the force-feeding of an otherwise competent adult.  This is in large part due to the reality that the procedures are painful and dehumanizing.  The Guantánamo experience, the dehumanization of the body, mind, and soul, deserves critical attention.

There needs to be active engagement, encouragement, and leadership to treat the Guantánamo prisoners humanely.  Recent trends in leadership fail in this duty.  Just as the events leading to the massacre at My Lai derived from the dehumanization of the Vietnamese, there should be no question that the root of war crimes and mistreatment of prisoners likewise requires one human being to dehumanize another:

> "We're supposed to learn from the mistakes of history, but we keep making the same mistakes," said Lawrence Colburn, whose helicopter landed in My Lai in the midst of the massacre. "That's what makes My Lai more important today than ever before."

> Colburn and Hugh Thompson, who w[ere] piloting their helicopter, landed between the soldiers and terrified villagers and are credited with stopping the slaughter by talking to their fellow troops.  Mike Boehm, another veteran in My Lai . . . said the slaughter reminded him of the 2005 scandal that emerged from the Abu Ghraib prison in Iraq, where US guards abused and sexually humiliated Muslim prisoners and photographed their actions.

> "If you follow the war in Iraq," Boehm said, "you can see nothing has changed.  At both My Lai and Abu Ghraib, there was a dehumanization of our enemy and a dehumanization of our own soldiers."[7]

Guantánamo Bay commanders must draw inspiration from Lawrence Colburn and Hugh Thompson who had the courage not only to defy unlawful orders and stop further atrocities against civilians; but also to see the "enemy" as human, even in war.  Instead, there has been a consistent command climate in Guantánamo to dehumanize the prisoners – the majority of whom are cleared for release and the rest who must be considered to be innocent until proven guilty by a competent court.

Obaidullah's gut-wrenching account speaks to this dehumanization.  The command response to the current political protest, putting detainees in solitary confinement and stripping away their dignity, is nothing less than dehumanizing.

Rear Admiral David B. Woods, former JTF-Commander, publicly expressed that he lost two comrades in the 9/11 attacks, and that he defined himself as part of the 9/11

---

[6] See http://www.lawfareblog.com/2013/05/obaydullah-on-the-hunger-strike/.
[7] See http://www.taipeitimes.com/News/world/archives/2008/03/16/2003405776.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

generation.[8]  The legality of Admiral Wood's unprecedented orders to search and seize confidential attorney-client legal materials in October 2011 remains the subject of active litigation and will continue to ripple throughout the subsequent litigation and appellate process.  Such statements by a commander should have raised a warning flag for the potential for the dehumanization of the prisoners.  While we were encouraged by Rear Admiral Woods's early transfer, which resulted in the shortest tenure in command of any JTF commander, the situation has not improved.

The risk of abuse of authority and the resulting dehumanization is so high, that the fitness and temperament of future commanders, JTF, JDG, and camp commanders, should be evaluated at the highest levels.  Commanders who have served in Iraq and Afghanistan, who themselves may have lost comrades, who were in combat, who experienced personal losses or sacrifices to their personal lives due to deployments, or who do not understand that the prisoners are innocent until proven guilty, should all be disqualified from consideration.

V.   <u>Request # 5:  Adopt the Recommendations in the 2009 DoD Study (Walsh Report)</u>

Detention practices currently in place in Guantánamo Bay violate Common Article 3 of the Geneva Conventions.  Although the Department of Defense concluded in 2009 that the conditions of confinement at Camp 7 satisfy Common Article 3, the current treatment standards belie this now stale finding made four years ago.[9]  In the first instance, we note that the methodology of the DoD Study was flawed from the start.  The report was merely an internal, executive level assessment that lacked any peer review.  It failed to solicit scrutiny or input directly from the detainees themselves, lawyers for detainees, and representatives of the International Committee of the Red Cross (ICRC), the U.N., the "Sending" states, and civil-society stakeholders.

Even though the report was methodologically flawed, Admiral Walsh, the director of the DoD Study, a high-ranking officer with no substantive experience and education on applying the laws of war and detention standards, did note his strenuous concerns about whether the confinement conditions at Camp 7 were humane:

> The concept of humane treatment requires the examiner to look at various factors in a continuum to assess whether what is humane today, is or will be humane over a longer period of detention. Treatment must be viewed in the context of specific and relevant circumstances to determine whether it is adequate.[10]

In furtherance of Common Article 3 guarantees, and to attempt to bring current practices into full compliance with law of war detention standards, the full adoption of Admiral Walsh's recommendations are, at a minimum, necessary as a matter of law.

---

[8] See http://www.miamiherald.com/2011/09/15/2409206/new-camps-chief-prepares-base.html.
[9] For the Department of Defense's 2009 determination, see
http://www.defense.gov/pubs/pdfs/REVIEW_OF_DEPARTMENT_COMPLIANCE_WITH_PRESIDE
NTS_EXECUTIVE_ORDER_ON_DETAINEE_CONDITIONS_OF_CONFINEMENTa.pdf.
(hereinafter "DoD Study").
[10] *Id.* at pg. 72.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

Specifically, we ask that you immediately implement Admiral Walsh's 2009 recommendations relative to Camp 7:

a.  Religious Practice: "Strongly recommend:
    - Give detainees in Camp 7 opportunities for group prayer with three or more detainees, similar to practices in other camps.
    - Continue to allow free exercise of religion to the maximum extent possible, within current security restrictions."  DoD Study, fn. 2, pg. 26.

b.  Recreation: "Strongly Recommend: Expand recreation options in Camp 7, including allowing for greater communal recreation opportunities among detainees (e.g., three or more detainees in recreation together, different recreation partners, etc.)."  *Id.* at 28.

c.  Intellectual Stimulation: "Recommend: Expand program content for intellectual stimulation, and provide for wider detainee access, subject to legitimate security concerns."  *Id.* at 35.

d.  Mail: "Recommend: Provide more properly trained staff and qualified translators to the Detainee Mail Processing Center (DMPC) for reviewing and redacting detainee mail, to further expedite its delivery."  *Id.* at 37.

e.  Protection from Solitary Confinement:

    "Strongly recommend:
    - Increase detainee-to-detainee contact in Camp 7, including the ability for detainees to communicate with each other from within their cells."

    Recommend:
    - Maximize interaction between detainees, communal living and recreation interaction, subject to security concerns.
    - Regularly conduct vetting, and ensure that qualified detainees are moved to communal living conditions subject to reasonable security concerns."  *Id.* at 46.

f.  Protection from Sensory Deprivation – Human-to-Human Contact:

    "Strongly recommend:
    - Increase detainee-to-detainee contact in Camp 7, including the ability for detainees to communicate with each other from within their cells.
    - Continue to allow maximum interaction between detainees, and maximize communal living and recreation interaction within reasonable security concerns.

    Recommend:
    - Seek ways to provide more frequent telephone calls.
    - Approve and implement family visits.
    - Approve and implement video teleconferencing with families."  *Id.* at 48.

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

Adopting Admiral Walsh's recommendations would be a positive step forward in improving the quality of life for Camp 7 detainees.  To echo Admiral Walsh's words more than four years ago:

> With regard to detainees held at Camp 7, who are the most limited in their human-to-human contact, the Review Team vigorously urges that additional steps be taken to increase detainee-to detainee contact, and offer them opportunities for group prayer and expanded recreation options.

*Id.* 72.  It has simply been too long.  Adopting these recommendations is critically important, and we appreciate your efforts to ensure that the U.S. observes its obligations under international humanitarian law.

VI.  <u>Request #6:  Establish an Independent Monitoring Committee to Investigate the Conditions of Confinement at Guantánamo Bay, to include Camp 7</u>

In this respect, we, as uniformed officers with education and experience advising on and applying the laws of war, do not believe that the conditions of confinement in Guantánamo Bay satisfy Common Article 3 of the Geneva Conventions.  We request that a thorough, independent review of the conditions of confinement for detainees in Guantánamo Bay occur immediately.

The review should consist of a variety of stakeholders outside of DoD components, to include the Department of State, the International Committee of the Red Cross, human rights representatives from each "Sending" State, and representatives from the U.N.'s Office of the High Commissioner for Human Rights.

On 1 May 2013,  the world's leading human rights monitors requested the U.S.'s support for independent monitoring at Guantánamo Bay.  The Inter-American Commission on Human Rights, the United Nations Working Group on Arbitrary Detention, the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, Ben Emmerson, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Juan Méndez, and the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health, Anand Grover, all called for immediate and independent monitoring of the situation at Guantánamo Bay.  The world is watching Guantánamo, and such a body would lend legitimacy and credibility to the review.

There should be no debate on the question of whether indefinite detention is lawful.  A review committee could address this question for you, and make urgent recommendations on a plan to ameliorate the suffering of the many "wrong place, wrong time" detainees.  With those detainees at Camp 7, an independent review committee must also assess whether the U.S. Government is violating several international humanitarian law norms:

(1) Right to Communicate:  JTF-GTMO has functionally severed the rights of Camp 7 detainees to communicate with their family.  They are not permitted to contact their families by telephone or video, contrary to the entitlements of other detainees at JTF-GTMO.  In lieu of an assessment by an independent committee, you have the power to change this now and direct JTF-GTMO to stop

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

incommunicado detention.  We would also request that you permit all detainees to communicate with their lawyers by telephone.  There is simply no valid reason why, when the capabilities exist for habeas lawyers, to deny commission lawyers the ability to communicate with their clients by telephone.

(2)  Right to Religious Observances:  Admiral Walsh noted in the 2009 DoD Study that Camp 7 detainees are not permitted to participate in group prayer and have limited recreational opportunities at Camp 7.[11]  Since May 2012, the military judge presiding over the military commissions, and JTF-GTMO have permitted the five men facing the death penalty in relation to the *U.S. v. Mohammad* prosecution to conduct communal prayer in the courtroom during recesses.  There have been no security incidents associated with the group prayer in the courtroom.  JTF-GTMO should continue this positive step forward by permitting communal prayer in Camp 7.  Finally, we understand that access to other religious materials has been inexplicably restricted for Camp 7 detainees, such as the sayings and descriptions of the life of the Prophet Mohammad (i.e. Hadith and Sunnah). In lieu of an assessment by an independent committee, you have the power to change this now and direct JTF-GTMO to grant the detainees the full right to observe in their religious traditions.

(3)  Conditions Amounting to Solitary Confinement.  The 2009 DoD Study addresses the severe curtailment of social, recreational, religious, and educational opportunities afforded to Camp 7 detainees.[12]  Worse, these structural limitations

---

[11] *Id.* at 72-73. ("With regard to detainees held at Camp 7, who are the most limited in their human-to-human contact, the Review Team vigorously urges that additional steps be taken to increase detainee-to-detainee contact, and offer them opportunities for group prayer and expanded recreation options, consistent with Commander, USSOUTHCOM initiatives. The conditions in Camp 7 are designed with security in mind, but limit communication and physical interaction between detainees. Detainees are currently limited to recreation with a single partner. In the area of religious practice, the detainees in all other camps are able to conduct group prayer and communal recreation. Allowing a variety of different detainees in groups of three or more to participate in recreation and prayer together will be a positive step toward greater socialization.").

[12] *See e.g, Id.* at 18 ("Camp 7 is a climate-controlled, single-cell facility currently used to house the High-Value Detainees. The cells in this facility are designed to limit communications between detainees"); *id.* at 25 ("At Camp 7, prayer is conducted individually in their cells"); *id.* at 27 ("All camps, except Camp 7, offer communal recreation – the opportunity for detainees to conduct exercise or social activities in a group of at least four – to as many as 22 detainees – simultaneously."); *id.* at 28 ("In Camp 7, there are limited opportunities for communal recreation, as detainees are limited to a single recreation partner (the same partner each day)"); *id.* at 34 (" Note, detainees in Camp 7 are not authorized telephone calls; all other detainees are"); *id.* at 34 ("Compliant detainees (except those in Camp 7) are also afforded opportunities to participate in Literacy, Humanities, and Art programs."); *id.* at 45 ("All detention cells, except in Camp 7, permit easy communication and interaction with other detainees in adjoining cells."); *id.* at 45 ("Detainees in Camp 7 are housed in cells that do not permit communication with adjacent cells. Detainees in Camp 7 also do not have the same level of socialization as detainees in other camps in Guantánamo"); *id.* at 47 ("For all detainees, except those in Camp 7, telephone calls are continually offered on a rotational basis through the population, and all detainees are offered at least one call quarterly, and more frequently if logistically possible"); *id.* at 48 ("Camp 7 cells limit human-to-human contact"); *id.* at 72 ("With regard to detainees held at Camp 7, who are the most limited in their human-to-human contact, the Review Team vigorously urges that additional steps be taken to increase detainee-to-detainee contact, and offer them opportunities for group prayer and expanded recreation options, consistent

Subject: Requests to Improve the Conditions of Confinement in Guantánamo

on their activities, coupled with the existing incommunicado detention regime, approximate conditions amounting to solitary confinement. We encourage an independent review team to assess whether the current conditions of confinement at Camp 7 give rise to solitary confinement that amounts to torture, or cruel, inhuman or degrading treatment. For your reference, we have attached an interim report by the Special Rapporteur for Torture on solitary confinement. The report finds that the physical conditions and the prison regime of solitary confinement can cause severe mental and physical pain or suffering. When solitary confinement is used as a punishment, during pre-trial detention, indefinitely, or prolonged, the report finds that it can amount to cruel, inhuman or degrading treatment or torture. In lieu of an assessment by an independent committee, you have the power to change this now and direct JTF-GTMO to social, recreational, religious, and educational opportunities afforded to Camp 7 detainees.

You could change the course and the consequences of the hunger strike right now Secretary Hagel by taking ownership of these issues during the political stalemate. At stake, as you know, is not just the inalienable right to human dignity – to be treated like a human being – but America's standing in the world.

Thank you for your consideration. We stand ready to assist in any way possible, and would welcome a meeting with you to discuss these matters further. The point of contact for this letter is CPT Jason Wright, who can be reached at ███████████ and by phone at █████████.

Respectfully submitted,


        //s//                                    //s//
DAVID Z. NEVIN, ESQ                  GARY D. SOWARDS, ESQ.
Nevin, Benjamin, McKay & Bartlett, LLP   Defense Counsel
Learned Counsel


        //s//                                    //s//
DEREK A. POTEET                      JASON WRIGHT
Maj, USMC                            CPT, USA
Military Defense Counsel             Military Defense Counsel

*Counsel for Mr. Mohammad*


        //s//
WALTER B. RUIZ
CDR, USN
Learned Counsel

*Counsel for Mr. al-Hawsawi*

---

with Commander, USSOUTHCOM initiatives. The conditions in Camp 7 are designed with security in mind, but limit communication and physical interaction between detainees").

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

//s//
JAMES HARRINGTON, ESQ
Harrington & Mahoney
Learned Counsel

//s//
KEVIN BOGUCKI
LCDR, USN
Military Defense Counsel

*Counsel for Mr. bin al-Shibh*

//s//
CHERYL BORMANN, ESQ
Learned Counsel

//s//
JAMES HATCHER
LCDR, USN
Military Defense Counsel

//s//
MICHAEL A. SCHWARTZ
Capt, USAF
Military Defense Counsel

*Counsel for Mr. bin 'Attash*

//s//
JAMES CONNELL, ESQ
Learned Counsel

//s//
STERLING THOMAS
Maj, USAF
Military Defense Counsel

*Counsel for Mr. al-Baluchi*

//s//
RICK KAMMEN, ESQ
Learned Counsel

//s//
ALLISON C. DANELS
Maj, USAF
Military Defense Counsel

//s//
DAPHNE L. JACKSON
Capt, USAF
Military Defense Counsel

*Counsel for Mr. al-Nashiri*

//s//
SEAN GLEASON
LtCol, USMC
Military Defense Counsel

//s//
CHRIS CALLEN
LTC, USA
Military Defense Counsel

*Counsel for Mr. al-Iraqi*

//s//
PATRICK J. FLOR
CDR, USN
Military Defense Counsel

*Counsel for Mr. al-Libi*

Subject:  Requests to Improve the Conditions of Confinement in Guantánamo

Encls.
(1) Ltr from Counsel to Mr. Lietzau, Denial of Minimum Guarantees of Common Article 3 at Camp 7, dtd. 24 Feb 2012.
(2) Special Rapporteur for Torture, Report on Solitary Confinement, U.N. GAOR, 66th Sess., Torture, and other cruel, inhuman or degrading treatment or punishment, U.N. Doc. A/66/150 (Aug. 5, 2011).