UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GUANTANAMO BAY DETAINEE CONTINUED ACCESS TO COUNSEL | Misc. No. 12-mc-398 (RCL) |
| SAEED MOHAMMED SALEH HATIM, *et al.*, Petitioners v. BARACK H. OBAMA, *et al.*, Respondents | Civil No. 05-cv-1429 (RCL) |
| FADHEL HUSSEIN SALEH HENTIF, *et al.*, Petitioners v. BARACK H. OBAMA, *et al.*, Respondents | Civil No. 06-cv-1766 (RCL) |
| ABDURRAHMAN ABDALLAH ALI MAHMOUD AL SHUBATI, *et al.*, Petitioners v. BARACK H. OBAMA, *et al.*, Respondents | Civil No. 07-cv-2338 (RCL) |

**MEMORANDUM OPINION**

Before the Court is Jason Leopold's Motion [48] to Intervene. Mr. Leopold, a reporter, seeks an order from this Court unsealing the Declaration of Col. John V. Bogdan, June 3, 2013, ECF No. 42-1 ("Bogdan Declaration" or "Bogdan Decl."), or in the alternative, an order

1

directing the government to file a redacted version of Col. Bogdan's declaration. Upon consideration of Mr. Leopold's Motion, the government's opposition and errata [59, 60, 62, and 63], the petitioners' reply [67], Mr. Leopold's reply [68], the entire record herein, and the applicable law, the Court will GRANT Mr. Leopold's Motion to Intervene and GRANT his request to unseal the Bogdan declaration.

## I. BACKGROUND

The pending motion is a result of an ongoing dispute over counsel access for detainees at the naval detention facility at Guantanamo Bay. The petitioners, detainees at Guantanamo detention facility, filed emergency motions to enforce their right of access to legal counsel on May 22, 2013, alleging that new search and meeting procedures at the facility interfered with their access to counsel. As part of its opposition to petitioners' motions, the government filed under seal a declaration by Col. John V. Bogdan, the commander of the Joint Detention Group ("JDG"), the group responsible for detention operations within Joint Task Force Guantanamo ("JTF-GTMO"). This declaration described in detail the new search procedures used by the JDG. Bogdan Decl. ¶¶ 19–22. The government filed the Bogdan Declaration under seal pursuant to the protective order issued by Judge Hogan in pending Guantanamo habeas cases. *See In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008) ("Protective Order" or "P.O."). This Court issued an order and accompanying memorandum opinion granting in part and denying in part petitioners' motions for counsel access. *In re Guantanamo Bay Detainee Litig.*, No. 12-mc-398 (RCL), 2013 WL 3467134 (D.D.C. July 11, 2013). Though the Court's opinion quoted Col. Bogdan's declaration substantially, the Court ruled pursuant to ¶ 34 of the Protective Order that the opinion should not be sealed and would instead be available on the public record. *Id.* at *2–4, *20.

After this Court issued its opinion, Mr. Leopold, a reporter, filed the present motions to intervene and to unseal the Bogdan declaration. On August 2, 2013, the government filed its opposition to Mr. Leopold's motion along with a redacted version of Col. Bogdan's declaration available for public release. Resp'ts' Opp'n to the Mot. of Jason Leopold to Intervene and to Unseal Certain Evidence, ECF No. 59. Initially, the government opposed unsealing all or parts of paragraphs 5, 6, 14, 16, and 19–22 of the Bogdan Declaration. Ex. 1, August 2, 2013, ECF No. 59-1. Subsequently, the government discovered it had publically filed a version of the Bogdan's Declaration with the Court of Appeals for the District of Columbia Circuit that failed to redact paragraphs 5, 6, 14, or 16. Errata 1, August 9, 2013, ECF No. 62. Consequently, the government revised its arguments and now only opposes unsealing the few redactions that remain in paragraphs 19–22 of the Bogdan Declaration. Ex. A-1, August 9, 2013, ECF No. 62-1.

"On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In this Circuit, third parties may "intervene under Rule 24(b) for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order." *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). Thus, the Court will GRANT Mr. Leopold's motion to intervene and will consider his motion to unseal Col. Bogdan's declaration.

## II. LEGAL STANDARD

Under the Protective Order, the government may ask the Court to deem protected any unclassified information by sharing that information with counsel for the petitioners, attempting to reach agreement with the petitioners as to whether the information should be protected, and making the appropriate motion to the Court. P.O. ¶ 34. Petitioners must treat any information

the government shares with them in this manner "as protected unless and until the Court rules that the information should not be designated as protected." *Id.* The ultimate authority to determine whether information should be protected, however, rests with the Court: "It is the court, not the government, that has discretion to seal a judicial record . . . which the public ordinarily has the right to inspect and copy." *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007) (citations omitted), *vacated on other grounds*, 554 U.S. 913 (2008). Accordingly, the District of Columbia Circuit in *Bismullah* rejected the government's "propos[al] unilaterally to determine whether information is 'protected'" and held that, "insofar as a party seeks to file with the court nonclassified information the Government believes should be 'protected,' the Government must give the court a basis for withholding it from public view." *Id.*

In *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), the government sought to deem protected two broad categories of information: "(1) 'any names and/or identifying information of United States Government personnel,' and (2) 'any sensitive law enforcement information.'" *Id.* at 852. To justify protecting the identifying information of government personnel, the government stated that "'[t]he risks to the safety of those personnel[, particularly those who often deploy to locations abroad,] would be heightened if their involvement in the detention of enemy combatants at Guantanamo were made public.'" *Id.* (alterations in original). With respect to sensitive law enforcement information, the government argued that "public disclosure 'could harm the Government's ongoing law enforcement activities related to the global war against al Qaeda and its supporters.'" *Id.* The court rejected the government's motion to deem the two categories of information protected because the government "relie[d] solely on spare, generic assertions of the need to protect information in the two categories it identifie[d]." *Id.* at 852–53. The court further noted that granting protection on the basis of such a thin justification would

4

enable the government to deem information protected unilaterally in the manner prohibited by *Bismullah*: "Without an explanation tailored to the specific information at issue, we are left with no way to determine whether it warrants protection—other than to accept the government's own designation." *Id.* at 853. Moreover, the Court of Appeals faulted the government for requesting protection for imprecisely defined categories of information, like "Law Enforcement Sensitive" information, that leave the court unable to "determine whether the information [the government] has designated [for protection] properly falls within the categories it has described." *Id.*

In *Ameziane v. Obama*, 699 F.3d 488 (D.C. Cir. 2012)[1], the Court of Appeals addressed the standard for the protection of information by the government when a detainee wanted to reveal the information. Ameziane, an Algerian citizen, had been cleared for release from Guantanamo and transfer to Algeria by the Guantanamo Review Task Force. *Id.* at 490–91. Since Ameziane did not wish to return to Algeria, however, he sought to use Task Force's transfer decision to petition Canada and France to accept him for resettlement. *Id.* The government moved to designate the transfer decisions made by the Task Force as protected information. *Id.* at 491. To support its motion, the government offered a declaration by Ambassador Daniel Fried,[2] the Special Envoy for the Closure of the Guantanamo Bay Detention Facility. In support of the government's motion, Ambassador Fried

---

[1] Because the government wished to protect the underlying information at issue in *Ameziane*, the D.C. Circuit originally issued its opinion in *Ameziane* in redacted form in 2010. 620 F.3d 1 (D.C. Cir. 2010). In 2012, the government lifted the protected status on the information. Resp'ts' Notice Lifting Protected Information, *In re Guantanamo Bay Detainee Litig.*, No. 08-mc-442 (TFH) (D.D.C. Sept. 21, 2012), ECF No. 1991. Subsequently, the D.C. Circuit reissued its opinion in *Ameziane* in unredacted form. 699 F.3d at 488. For purposes of clarity, this Court cites the unredacted version of the D.C. Circuit's opinion in *Ameziane*.

[2] The government subsequently lifted the protected status on transfer decisions of the Guantanamo Review Task Force and filed an unredacted copy of Ambassador Fried's declaration. *See* Resp'ts' Notice Lifting Protected Information, *In re Guantanamo Bay Detainee Litig.*, No. 08-mc-442 (TFH) (D.D.C. Sept. 21, 2012), ECF No. 1991.

> explained that if these petitioners, in an effort to be resettled in European countries of their choice, all "approach the same small group of governments at the same time, particularly if they relay information about formal U.S. government decisions resulting from review by the . . . Task Force, it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many [detainees] to safe and responsible locations as might otherwise be the case."

*Id.* (alteration in original).

The district court denied the government's motion. *Id.* The district court complained that the government's argument was not particularized to Ameziane and that Ambassador Fried's declaration "'provide[d] no specificity as to why Ameziane's cleared status must be protected or why his counsel should be prohibited from using the information to advocate for his resettlement to other countries.'" *Id.* The district court also noted that it found the government's national security concerns "speculative" and thought protecting Ameziane's cleared status was unnecessary as the Red Cross and Ameziane's brother both already knew about his cleared status. *Id.* at 491–92. On appeal, however, the District of Columbia Circuit reversed and allowed the government to designate the Task Force transfer decisions as protected information.

The Court of Appeals held that "a valid 'basis for withholding' [information as protected] would include, at a minimum, a 'specific,' 'tailored' rationale for protecting a general category of information, and a precise designation of each particular item of information that purportedly 'falls within the categor[y] . . . described.'" *Id.* at 494–95 (second alteration in original) (quoting *Parhat*, 532 F.3d at 853). "In other words, the government must first demonstrate *what kind* of information requires protection and *why*, and then must show exactly *what* information in the case at hand it seeks to protect." *Id.* at 495 (emphasis in original). Moreover, the Court of Appeals clarified that

6

> *Parhat* did not require the government to provide a rationale for protection that was so specific as to preclude any generalized categorization. Rather, *Parhat* left room for categorized requests in appropriate circumstances. Of course, the narrower the category for which the government seeks protection, the more likely the government's rationale will be sufficiently tailored.

*Id.*

Applying the standard from *Parhat*, which the Court of Appeals interpreted as a two-step test, the Court of Appeals found that the government had met its burden to protect the Task Force transfer decisions. Under the first step of the *Parhat* test, the Court found (1) that the government had designated a narrow category of information requiring protection—the transfer decisions and any related documents; (2) that the government had provided a "detailed rationale tailored specifically to the information in the narrow category"; and (3) that the government had "logically explained why failing to protect Task Force transfer decisions was likely to harm the government's foreign relations and national security interests." *Id.* at 496. With respect to the second step under the *Parhat* test, the Court of Appeals concluded that

> The government designated for protection a precise item of information—Ameziane's transfer decision—that indisputably falls into the narrow category of Task Force transfer decisions. Indeed, this case fits squarely within the government's rationale for protection. Although the government has determined Ameziane can safely be repatriated to Algeria, he is seeking to obtain resettlement in Canada or France, and wishes to utilize his Task Force transfer decision to aid him in petitioning these foreign governments. As the Fried Declaration explains, permitting Ameziane to make such use of the government's official information would interfere with the Secretary of State's efforts to focus the Canadian and French governments on accepting detainees who, unlike Ameziane, cannot safely be repatriated to their home countries. Thus, the government met its burden for protection under *Parhat*.

*Id.* at 496–97.

The Court of Appeals also admonished the district court for failing to defer to the government's assessment of the harm that would result from disclosure of the Task Force

7

transfer decisions. The Court of Appeals noted that, "[b]ecause the government satisfied *Parhat*, the district court was required to defer to the government's assessment of the harm to foreign relations and national security that would result from officially disclosing" the protected information. *Id.* at 497. Thus, the district court could not "perform[] its own calculus" to conclude that Ameziane's interest in using the information outweighed the government's interest in protection. *See id.* (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990)).

Most recently, this Court addressed the government's request to protect certain information in *In re Guantanamo Bay Detainee Litigation*, 787 F. Supp. 2d 5 (2011) (Hogan, J.) (redacted). There, the government asked the Court to rule that six categories of information be designated as protected information under the Protective Order: (1) names of certain government employees or family members of detainees; (2) information revealing the "existence, focus, or scope of law enforcement or intelligence operations"; (3) information regarding locations relevant to counter-terrorism, intelligence gathering, military, or law enforcement operations not previously acknowledged by the government; (4) information showing or related to knowledge of communications by known or suspected terrorists, including phone numbers, e-mail addresses, and websites; (5) "[i]nformation regarding the use, effectiveness, or . . . implementation of certain [approved] interrogation approaches or techniques"; and (6) certain administrative data included in the factual returns filed in pending cases, including "operational 'nicknames,' code words, dates of acquisition, including dates of interrogations, and FBI case names and file numbers." *Id.* at 8. For each of these six categories, Judge Hogan found that the categories were narrowly tailored and that the government offered detailed and logical explanations as rationales for why the category should be protected. *See id.* at 15–25 (analyzing the government's six proposed categories of information under the first step of the *Parhat* test).

8

Thus, Judge Hogan concluded that each of the proposed categories passed the first step under the *Parhat* analysis.

While Judge Hogan approved the six proposed categories for protection under *Parhat*'s first step, he found that *Parhat*'s second step required a case-by-case approach. In analyzing *Parhat*'s second step, Judge Hogan noted that "[t]he D.C. Circuit's analysis in *Ameziane* suggests that determining whether the information [the government seeks to protect] falls within the protected category requires evaluating whether the rationale for protection asserted [under *Parhat*'s] first step is implicated by the specific information the government has designated for protection in the second step." *Id.* at 13 (citing *Ameziane*, 620 F.3d at 7). In other words, the district court must determine, as the Court of Appeals did in *Ameziane*, whether the information the government seeks to protect "fits squarely within the government's rationale for protection." *Ameziane*, 699 F.3d at 496. Thus, Judge Hogan concluded that the application of *Parhat*'s second step "require[d] a case-specific or document-specific determination about whether information designated for protection properly falls in one of the six categories." *In re Guantanamo Bay Detainee Litig.*, 787 F. Supp. 2d at 26. Accordingly, Judge Hogan only approved the government's proposed categories under *Parhat*'s first step and left the ultimate determination as to whether any specific information should be protected to the merits judges in individual habeas cases. *Id.*

In summary, *Bismullah*, *Parhat*, and *Ameziane* control when the government may designate nonclassified but sensitive information as protected. The government may not unilaterally decide what information will be protected. Instead, under *Parhat*'s first step, the government must justify protecting information by (1) designating a category of information for protection and (2) explaining in a tailored, detailed, and logical fashion why that category

9

requires protection. The government may not justify protection on the basis of "spare" or "generic" rationales, though the rationale need not be "so specific that it precludes any generalized categorization." *Id.* at 13. As a general matter, narrowly designated categories are more likely to have sufficiently tailored rationales. *Id.* Under *Parhat*'s second step, the government must show that the specific information to be protected "fits squarely" within the designated category. Finally, if the government establishes that information is subject to protection under *Parhat*, the Court must defer to the government's assessment of the harm to national security from disclosure of the information.

### III. ANALYSIS

#### A. The Government Only Receives Deference After It Satisfies the *Parhat* Test

The government argues that, in applying the *Parhat* test, "a reviewing court must account for any deference owed by the judiciary to the underlying government interest." Resp'ts' Errata Ex. A at 5, Aug. 9, 2013, ECF No. 63 ("Errata Opp'n"). Under the government's logic, since "[t]he judiciary has routinely deferred to the Executive in matters of prison security," the Court "should defer to the military's assessment of the threat created by the public disclosure of COL Bogdan's discussions of the security procedures and guard operations at Guantanamo Bay." *Id.* at 6–7. Courts generally accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 128 (1977); *Meachum v. Fano*, 427 U.S. 215, 228–29 (1976); *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974); *Cruz v. Beto*, 405 U.S. 319, 321 (1972)). Nevertheless, the court need not defer to the government in evaluating its proffered rationale to justify protecting the Bogdan Declaration under *Parhat*.

10

Indeed, the government's argument for deference confuses the roles of the Executive and the Judiciary.

Initially, the Court must note the conceptual difference between substantive issues of prison or military administration and the issue of whether court documents describing prison procedures should be kept under seal. The former is a matter committed to the Executive, *see id.* at 548 ("[T]he operation of . . . correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."), but the latter falls within the Court's expertise, *see Bismullah*, 501 F.3d at 188 ("It is the court, not the Government, that has discretion to seal a judicial record, which the public ordinarily has the right to inspect and copy." (internal citations omitted)). The government's argument for deference is inapposite because none of the cases the government cites as compelling deference by the Court actually deal with sealing court documents. To give one example, *Bell v. Wolfish* was a constitutional challenge to "numerous conditions of confinement and practices at the Metropolitan Correctional Center (MCC), a federally operated short-term custodial facility in New York City."[3] 441 U.S. at 523. This Court is unaware of any effort to seal court documents related to the practices at issue in *Bell*—practices that included "strip search[es] conducted after every contact visit [by a detainee] with a person from outside the [MCC]." *Id.* at 558. To the contrary, the district court described the procedure for the strip searches in detail in its published opinion. *See U.S. ex rel. Wolfish v.*

---

[3] The other cases the government cites in support of its argument for deference concern, respectively, an environmentalist group's effort to enjoin the Navy's use of mid-frequency active sonar during training exercises, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 12–15 (2008); a First Amendment free exercise claim by a Jewish Air Force officer against Air Force regulations that prohibited him from wearing a yarmulke while on duty, *Goldman v. Weinberger*, 475 U.S. 503, 504–07 (1986); and a claim by non-liturgical Protestant chaplains that the Navy systematically discriminated against them in awarding promotions, *In re Navy Chaplaincy*, 697 F.3d 1171, 1173 (D.C. Cir. 2012).

*Levi*, 439 F. Supp. 114, 146 (S.D.N.Y. 1977) ("Under the questioned practice, every inmate . . . undergoes a strip search upon returning to his quarters from any visit. In the presence of a corrections officer, the male inmate must remove his clothes, display his armpits, open his mouth, raise his genitals, display the bottoms of his feet, and spread his buttocks for visual anal inspection. Female inmates must follow a similar procedure, including a visual vaginal inspection."), *aff'd in part and rev'd in part*, 573 F.2d 118 (2d Cir. 1978), *rev'd*, 441 U.S. 520 (1979).

The government's argument for deference in the Court's *Parhat* analysis states the law backwards: *Ameziane* requires a court to defer to the government's assessment of harm once the government has *already* met the requirements of *Parhat*. *Ameziane*, 699 F.3d at 497. In *Ameziane*, the Court of Appeals only turned to the issue of deference after it concluded in its analysis that the government had satisfied both steps of the *Parhat* test. *Id.* In context, it is clear that the Court of Appeals admonished the district court not for failing to apply deference to the government's proffered rationale under *Parhat* but for concluding that some other interest outweighed the protection the government was due under *Parhat*. *See id* at 497–98 ("In particular, the district court erred by elevating Ameziane's interest in being resettled in a country of his choice over the government's interest in repatriating or resettling as many detainees as possible as quickly as practicable in order to close Guantanamo as the President directed. Such prioritizing was an executive prerogative, and it was 'not within the role of the [district] court[] to second-guess executive judgments made in furtherance of that branch's proper role." (quoting *Bismullah*, 501 F.3d at 187–88) (alterations in original)). Once the government establishes that information is subject to protection under *Parhat*, that protection is not itself subject to balancing. *See In re Guantanamo Bay Detainee Litig.*, 787 F. Supp. 2d at 24 (noting that the

Court lacks authority to unseal information protected under *Parhat* because "the public interest in certain information outweighs the harm to national security or foreign relations"). Though attempting to balance the government's interest in protecting information with the public's interest in disclosure would constitute error, that does not imply that the Court must defer to the government's own assessment of whether its proffered rationale for protection is sufficiently tailored, detailed, and logical to pass the *Parhat* test. To do so would create the very situation *Bismullah* sought to avoid by allowing the government unilaterally to determine whether information should be protected. *See Bismullah*, 501 F.3d at 188.

Thus, this Court will only defer to the government's assessment of the harm that would result to national security or foreign relations from disclosing the Bogdan Declaration if the Court concludes that the it merits protection under *Parhat*.

**B.     The Government Fails to Justify Protection for the Bogdan Declaration Under *Parhat*'s First Step**

The government seeks to protect part of paragraphs 19, 20, and 22 and all of paragraph 21 of the Bodgan Declaration. In support of its argument that these paragraphs should be protected and remain under seal, the government relies on a second declaration by Col. Bogdan, signed August 2, 2013. Decl. of Col. John V. Bogdan, Aug. 2, 2013, ECF No. 60-1 ("Second Bogdan Declaration" or "2d. Bogdan Decl."). The Second Bogdan Declaration provides the government's rationale for protecting the designated paragraphs of the original Bogdan Declaration. The government originally filed the Second Bogdan Declaration under seal, though the government subsequently filed a redacted version on the public docket. Notice of Filing, Aug. 22, 2013, ECF No. 69.

In light of the government's errata, which withdrew the government's request for protection of paragraphs 5, 6, 14, and 16 of the First Bogdan Declaration, the Court will confine its analysis to those paragraphs—19 through 22—that the government still seeks to protect. The Court must note that, while the government submitted an edited version of its opposition in its errata that focuses its argument solely on protecting paragraphs 19 through 22, Resp'ts' Errata, Aug. 9, 2013, ECF No. 63, the government neglected to obtain a revised version of the Second Bogdan Declaration. Consequently, the Court must carefully review Col. Bogdan's Second Declaration pursuant to the reduced protection the government now seeks.

In its opposition, the government describes the remaining redactions in the Bogdan declaration as "protect[ing] sensitive operational-security and force-protection measures in place at JTF-GTMO." Errata Opp'n 7. As an initial matter, it is unclear to the Court given this description of the information the government seeks to protect how broad or narrow a category it seeks to define: the government fails to make any explicit statement, whether by reference to *Parhat*, *Ameziane*, or otherwise, to declare the precise category of information it seeks to protect. Implicitly, the category must be information regarding operational-security and force-protection measures, though the Court must ascertain whether this category is limited to those procedures in place at the Guantanamo detention facility or whether it encompasses all operational-security and force-protection procedures generally. To the extent that the government justifies protection of the redacted paragraphs on the basis that the operational-security and force-protection measures described therein are used both at Guantanamo and at other detention facilities in the United States, *id.* at 7; 2d. Bogdan Decl. ¶ 7, it appears the government intends the latter. Further, the government nowhere defines what constitutes an operational-security or force-protection measure.

14

In its broadest form, this category cannot survive the *Parhat* analysis. As the Court of Appeals concluded in *Parhat*, an ill-defined category offers the Court no "basis upon which [it] may determine whether the information [the government] has designated properly falls within the categor[y] it has described." 532 F.3d at 853. The categories that the Court of Appeals approved in *Ameziane* and that this Court approved in *In re Guantanamo Bay Detainee Litigation* were phrased using terms specific enough that the Court could understand what information would fall within the protected category: It is clear at a moment's notice, for example, whether a document is a Task Force transfer decision or incorporates information from a Task Force transfer decision. *See Ameziane*, 699 F.3d at 496 (describing "Task Force transfer decisions" as a narrow category and noting that the court "face[d] no difficulty 'determining whether the information . . . designated properly falls within the categor[y] . . . described'" (quoting *Parhat*, 532 F.3d at 853) (second alteration in original)). By contrast, a category defined as "information relating to operational-security and force-protection measures"—like "Law Enforcement Sensitive" information—offers the court no way to evaluate what information falls inside or outside of the category absent a specific definition of the terms "operational-security measures" and "force-protection measures." Since the government does not define these terms, the Court cannot conclude that the government's proposed category is sufficiently tailored to pass muster under *Parhat*.

Even assuming that the government corrected the problems in the definition of its proposed category, either by defining "operational-security or force-protection measure" or by limiting the proposed category solely to those measures in effect at Guantanamo Bay, the government's argument for protection still fails under *Parhat* because the government's rationale for protection is insufficiently tailored, detailed, and logical. As the Court of Appeals remarked

15

in *Ameziane*, "the narrower the category for which the government seeks protection, the more likely the government's rationale will be sufficiently tailored." *Id.* at 495. The Court of Appeals' analysis does not indicate, however, that a proffered narrow category of information will always have a tailored rationale. If, for example, the government "relie[d] solely on spare, generic assertions of the need to protect information in the . . . categories it identifies," *Parhat*, 532 F.3d at 852–53, as both *Parhat* and *Bismullah* forbid, the Court must find the proposed rationale insufficient.

The government's proffered rationales for protection fail under *Parhat* because they rely solely on "spare [and] generic assertions" of the need to protect information regarding operational-security and force-protection measures. The government offers four rationales for protecting this information, all of which are insufficiently detailed under *Parhat*. First, the government argues that disclosing the information would "enable our enemies, foreign or domestic, to better prepare for an assault or operation against JTF-GTMO." 2d. Bogdan Decl. ¶ 8; *see also id.* ¶ 6. The extent of the detail the government provides under this rationale is that the information contained within the redacted portions of the original Bogdan Declaration "would be useful to an enemy for identification and targeting purposes" and that it would enable our enemies to create "a blueprint of JTF-GTMO security operations." *Id.* ¶ 6. The Court cannot accept this rationale because it is just as spare and generic as the rationales the Court of Appeals rejected in *Parhat*. Like the government's rationale for protection in *Parhat*, the government simply asserts that disclosure of the protected information would be harmful. *See Parhat*, 532 F.3d at 852 (Disclosure of Law Enforcement Sensitive information "'could harm the Government's ongoing law enforcement activities related to the global war against Al Qaeda and its supporters.'"). In contrast, Ambassador Fried's declaration in *Ameziane* explains in great

detail how allowing a detainee to use Task Force transfer decisions to lobby other countries for resettlement would disrupt the government's efforts to resettle other detainees, rather than merely asserting the problem exists. *See* Decl. of Daniel Fried ¶¶ 3–8, *In re Guantanamo Bay Detainee Litig.*, No. 08-mc-442 (TFH) (D.D.C. Sept. 9, 2012), ECF No. 1991-1. Thus, the government's first rationale fails under *Parhat*.

As a second rationale for protection, the government argues that the redacted portions of the original Bodgan Declaration contain "force protection measures [that] are essential to the need to maintain security [at JTF-GTMO and other] detention facilities to protect the staff, inmates, and visitors." 2d. Bogdan Decl. ¶ 7. While the government again fails to explain this assertion in detail, it does point to a citation to "unclassified, but sensitive" information contained within the redacted portion of the Bogdan declaration. *Id.* The government contends that revealing this citation in the context of the force-protection procedures also included in the redacted portions of the declaration could "compromise tactics, techniques, and procedures used at various [redacted] detention facilities." *Id.* To the extent that the government intends to protect its strategies in employing certain operational-security or force-protection procedures, as opposed to the actual procedures themselves, the government's categorization and rationale is in principle similar to the fifth category of information Judge Hogan approved for protection in *In re Guantanamo Bay Detainee Litigation. See* 787 F. Supp. 2d. at 23 ("The government does not seek to protect the types of [interrogation techniques] used, which are publically available, but rather the 'manner and strategy in which they are employed.'"). Generally, the government provides a similar rationale for protection in both cases, namely that exposing information about the strategy by which the government uses certain techniques could compromise those techniques' effectiveness. Nevertheless, the Court need not examine this rationale in greater

17

detail to see if it suffices under *Parhat* because the government has waived protection for this citation by failing to redact it in paragraph 17 of the publically disclosed version of the original Bogdan Declaration. *See* Ex. 1 ¶ 17, Aug. 9, 2012, ECF No. 62-1.

The government also asserts, as its third rationale for protection, that dissemination of the redacted portions of the original Bogdan Declaration would "allow [detainees or our enemies] to manipulate or undermine operational security [at Guantanamo] and threaten the security of the guards, detainees, and visitors." 2d. Bogdan Decl. ¶ 6. Similarly, as a fourth rationale, the government asserts that release of the redacted information "would present risks to operational security and force protection in current detention operations, or if combined with other information, could create risks to national security or endanger U.S. personnel." *Id.* ¶ 8. Again, the government offers no further details to explain its rationales and to show that they are both tailored and logically related to the category it has designated for protection. As the Court explained above, such spare and generic assertions of the need for protection are insufficient for the Court to deem information protected under *Parhat*.

In closing, the Court turns to the government's argument that there is a difference between the Court unsealing the information redacted in the original Bogdan Declaration and the release of that information through this Court's previous Memorandum Opinion. 2d. Bogdan Decl. ¶ 9; *see* Mem. Op. at 4–8, *In re Guantanamo Bay Detainee Litig.*, No. 12-mc-398 (RCL) (D.D.C. July 11, 2013), ECF No. 47, 2013 WL 3467134 at *2–4 (quoting and citing the original Bogdan Declaration as part of the factual background of the case). Under the government's logic, the former would be directly attributable to Col. Bogdan while the latter is not. 2d. Bogdan Decl. ¶ 9. The government's argument raises a fair point. *Cf. Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) ("[I]n the arena of intelligence and foreign relations there can be

a critical difference between official and unofficial disclosures."). This argument is not, however, a rationale for why operational-security or force-protection measures should be a protected category of information. The government's argument will not suffice absent some justification for protection under *Parhat*, which the government fails to provide.

## C. Col. Bogdan's Second Declaration, as Well as the Briefs Relating to Mr. Leopold's Motion to Unseal the First Bogdan Declaration, Should Also be Unsealed

In their replies, both Mr. Leopold and the Petitioners request that Col. Bogdan's Second Declaration be unsealed. Pet'rs' Reply 2, August 12, 2013, ECF No. 67; Reply in Support of Jason Leopold's Mot. to Intervene 1, August 16, 2013, ECF No. 68 ("Leopold Reply"). The Petitioners also request that the Court unseal their reply and the government's opposition. Pet'rs' Reply at 2. The government argues that Col. Bogdan's Second Declaration should remain protected because (1) it discusses why the First Bogdan Declaration should be protected and (2) the reasoning in that discussion "contain[s] and independently constitute[s] operational-security and force-protection information." Second Bogdan Decl. ¶ 10. As the Court explained above, the government's terse justification for protecting the Second Bogdan Declaration is completely insufficient under *Parhat*. For the reasons set forth above, the Court will also unseal Col. Bogdan's Second Declaration as well as the government's opposition and errata and the Petitioners' reply.

## IV. CONCLUSION

Before the Court will deem nonclassified information protected, "the government must give the court a basis for withholding [the information] from public view." *Bismullah*, 501 F.3d at 188. The government has failed to do so here. In light of the Court's decision that the government has failed to justify protection for the First and Second Bogdan Declarations, the

19

Court need not address the First Amendment arguments that Mr. Leopold presents. The Court will unseal Col. Bogdan's First and Second Declarations, the government's opposition and errata [60, 63], and the Petitioners' Reply [67].

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on September 17, 2013.